**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COPY PROTECTION LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 14-365 (LPS) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| NETFLIX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NETFLIX, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Clay C. James
C. Matthew Rozier
Aaron S. Oakley
HOGAN LOVELLS US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel:  (303) 899 7300

Melissa J. Baily
James D. Judah
Adam Botzenhart
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
Tel:  (415) 875-6600

Dated:  May 22, 2015
1190730 / 41572

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Defendant Netflix, Inc.*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................1

III.  ARGUMENT .....................................................................................................2

    A.   "Program" (claims 9, 11, 19, and 23) and "program portion" (claims 1, 10, 22, and 25) .........................................................................................................2

    B.   "Selectively controlling access to" (claim 1) / "suppress" (claim 9) / "restrict[ing] or prevent[ing]" (claims 10, 11, 19, and 25) "copy or save functions at the client in respect of the data in its unprotected form" ...................6

        1.   Construing "selectively controlling access to" to include *enabling* copy and save functions runs counter to the purpose of the alleged invention and all intrinsic evidence ...........................................................7

        2.   The body of these limitations should be construed as disabling "functionality to copy or save the unprotected data that would otherwise be available at the client" ...........................................................8

        3.   "Unprotected data" is not limited to "decrypted." ...................................10

    C.   "Determining a machine identifier of the client by analysing its hardware and/or its software configuration" (claim 18) .......................................................11

    D.   "A server" (claims 1, 9, 10, 11, 19, 23, 25) and "a server computer" (claims 9, 11, 19, 23) .......................................................................................12

    E.   "Cryptographically protecting the data" (claims 1, 10, and 25) and "sending the cryptographically protected data to the client" (claims 1, 10, and 25) ...............................................................................................................14

    F.   "A request for access to data" (claims 1 and 10) .................................................16

    G.   Order of Steps (Claims 1, 10, 25) .......................................................................17

        1.   The Steps Are Written in a Logical Order .............................................18

        2.   The Specification Directly and Implicitly Requires an Order of Steps ...................................................................................................19

IV.   CONCLUSION.................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aerotel, Ltd. v. Telco Group, Inc.*,
  2010 WL 1916015 (S.D.N.Y. May 12, 2010) .........................................................................18

*Aerotel, Ltd. v. Telco Group, Inc.*,
  433 Fed. Appx. 903 (Fed. Cir. 2011)......................................................................................18

*AFG Indus. Inc. v. Cardinal IG Co.*,
  239 F.3d 1239 (Fed. Cir. 2001)................................................................................................1

*Chimie v. PPG Industries, Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005)................................................................................................8

*Envirotech Corp. v. Al George, Inc.*,
  730 F.2d 753 (Fed. Cir. 1984)..................................................................................................1

*FotoMedia Technologies, LLC v. AOL, LLC*,
  2009 WL 2175845 (E.D. Tex. July 21, 2009) ...............................................................13, 14

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)................................................................................................8

*Lucent Techs., Inc. v. Extreme Networks*,
  367 F. Supp. 2d 649 (D. Del. 2005)........................................................................................2

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)..........................................................................................1, 2, 4

*MasterObjects, Inc. v. Google, Inc.*,
  2013 WL 2319087 (N.D. Cal. May 28, 2013) .......................................................................14

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
  474 F.3d 1323 (Fed. Cir. 2007)........................................................................................11, 12

*Mformation Technologies, Inc. v. Research in Motion Ltd.*,
  764 F.3d 1392 (Fed. Cir. 2014)..............................................................................................18

*Michael S. Sutton Ltd. v. Nokia Corp.*,
  647 F. Supp. 2d 737, 743 (E.D. Tex. 2009), *aff'd* 2010 WL 5230901 (Fed. Cir. 2010) .........19

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998)................................................................................................5

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................................1, 4, 17

*Respironics, Inc. v. Invacare Corp.*,
    303 Fed. Appx. 865 (Fed. Cir. 2008) ..............................................................................19, 20

*Teleflex, Inc. v. Ficosa North America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ........................................................................................3

*Zapmedia Servs., Inc. v. Apple, Inc.*,
    2010 WL 8599970 (E.D. Tex. Aug. 19, 2010) ....................................................................14

## STATUTES

35 U.S.C. § 112 ..........................................................................................................8, 10, 11, 12

## I.      INTRODUCTION

The underlying purpose of claim construction is to interpret the claims as a matter of law in order to assist the jury in understanding their scope.  Consistent with that purpose, Netflix, Inc.'s ("Netflix") proposed constructions are derived directly from the intrinsic evidence.  In contrast, Copy Protection LLC's ("Copy Protection") proposals ignore the intrinsic evidence, and in many cases directly contradict it.  Many are so vague, and divorced from the teachings of the patent, that they would serve only to confuse and mislead the jury.  The court should adopt Netflix's proposed constructions.

## II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction "is a matter of law" for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  Its purpose is to explain, in words the jury can understand, how one of ordinary skill in the art would have understood the claims when read in light of the specification and prosecution history.  *See, e.g.*, *AFG Indus. Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) (trial courts should construe all material terms, as the constructions become the basis for jury instructions); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.").  Thus, courts must consider the literal language of the claim, the patent specification and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification is "always highly relevant to the claim construction analysis.  Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1312-17 (citing *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

A court also should interpret a claim by applying the ordinary and accustomed meaning of its terms.  *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed. Cir. 1984).  Generally,

there is a strong presumption in favor of the ordinary meaning of claim language as understood by those of ordinary skill in the art.  *Lucent Techs., Inc. v. Extreme Networks*, 367 F. Supp. 2d 649, 653 (D. Del. 2005) (citing *Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001)).  However, if the patent inventor clearly supplies a different meaning, then the claim should be interpreted according to the meaning supplied by the inventor.  *Markman*, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer).

## III.   ARGUMENT

### A.   "Program" (claims 9, 11, 19, and 23) and "program portion" (claims 1, 10, 22, and 25)

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| program portion | set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed | part of a program |
| program | [same as program portion] | sequence of instructions that can be executed by a computer |

The parties' proposals differ in two ways:  1) the proper construction of "program portion" and 2) whether "program" has a different meaning than "program portion" in the context of this patent and the prosecution history.  The terms "program portion" and "program" are recited in different claims but used interchangeably.  For example, claim 10 recites a "program portion" that converts data to an unprotected form and restricts access to copy and save functions at a client device, e.g., a computer or mobile phone, with respect to that data, while claim 11 recites a "program" that performs those exact same steps.  Netflix addresses both terms together because the applicants used them synonymously and the intrinsic evidence dictates that they have the same scope.

It is well settled that a patentee can choose to be his own lexicographer if he defines a term "with reasonable clarity, deliberateness, and precision" and that such a definition can appear in the prosecution history as well as the specification.  *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *Vitronics*, 90 F.3d at 1582).  Here, applicants expressly defined "program portion" during prosecution and disclaimed any interpretation broader than that definition.  Netflix's proposed construction is that definition, verbatim.  In contrast, Copy Protection's proposal ignores the express definition, contradicts the specification and prosecution history, and provides no meaningful direction to the jury.

The term "program portion" does not appear in the '649 patent's specification or in the claims as originally presented to the PTO; it was added by amendment during prosecution.  (D.I. 53, Ex. C-3 at COPYP0000259-267).  Facing a final rejection of all pending claims, including one based on U.S. Patent No. 6,055,314 to Spies ("Spies") (*id*. at COPYP0000073), applicants filed an appeal brief (*id*. at COPYP0000068-88), which attempted to  distinguish Spies as follows:

> Claim 1 therefore requires that the same program portion generates and uploads a request for access to data and performs conversion of the cryptographically protected data to an unprotected form. **The "same" program portion forms a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed** (although when they are executed, it would be in the context of the instructions being part of a single entity).

(*Id*. at COPYP0000077 (emphasis added)).

> In contrast [to the '649 patent] ...Spies discloses using a separate program - a 'decryption routine' in the embodiment shown in Fig. 7 or a separate 'decryption unit' in the embodiment illustrated in Fig. 8 - to control perform [sic] the decryption of the downloaded data.  The decryption routine or decryption unit is therefore not the same program portion or unit as that which (e.g., the portioning application program) generates and uploads the request (order) for access to video data.

(*Id*. at COPYP0000078).  This express definition, which applicants supplied and relied on to

obtain the '649 patent, must control.  *Markman*, 52 F.3d at 980; *see also Phillips*, 415 F.3d at 1316.

Copy Protection's proposed construction of "program portion" as "part of a program" is inconsistent with the specification and prosecution history, and that phrase does not appear in either of them.  Moreover, defining it as "part" of a program is inconsistent with the applicants' representation that the "program portion" must function as an *independent* program, i.e., as a "set of instructions forming a single entity, defined independently of the processing environment." (D.I. 53, Ex. C-1 at COPYP0000077).  It is a program, not a part of a program.  In the sense used by the applicants in distinguishing *Spies,* it is a program portion *of the client*; i.e., it is a portion of the client that is or contains a program.  (*See, e.g.*, D.I. 53, Ex. B at claim 1 ("running a program portion at the client").

The specification does not distinguish between "program" and "program portion," and does not use either term to describe the claimed subject matter.  Not surprisingly, Copy Protection cites to the exact same passages of the specification as intrinsic evidence for both terms (D.I. 53)[1], because the applicants consistently treated them as synonyms.  For example, applicants designate a Java applet as both a "program portion" and a "program":

- "[I]n the present invention, it is **the program portion (e.g., a Java applet)** that is being used to restrict access to functions that would otherwise be legitimately available at the client…."  (D.I. 53, Ex. C-3 at COPYP0000270 (emphasis added)).

- "When a user operating client computer 3 requests access to data, such as a particular webpage, instead of server 1 just sending the requested data to client computer 3, **another program (an applet)** is triggered to run at client computer 3…."  (D.I. 53, Ex. C-1 at COPYP0000072 (emphasis added); *see also* D.I. 53, Ex. C-2 at COPYP0000160).

---

[1] Copy Protection does cite to 13:38-40 as intrinsic evidence for "program" but not for "program portion."  However, that citation is to claim 22, not the specification, and the cited language was not included in the claims as originally filed, but rather was added during prosecution of the '649 patent.

If these two terms apply in the same way to the same embodiment, then they must be the same

thing.  Hence, even if "program portion" did, in the abstract, mean "part of a program," in the

context of this patent, the scope of "part of a program" must be broad enough to include the

whole program.

   Applicants' arguments to the USPTO also show they treated the terms "program" and

"program portion" as identical in scope.  For example, their Appeal Brief states that the

"program" claims (pending claims 30, 33, 34, and 36) and the "program portion" claims

(pending claims 1, 28, 29, 31, 32, and 35) "require similar limitations," and argued with respect

to both sets of claims that "the access to copy or save functions in its unprotected form is

controlled by execution of a <u>program portion</u>."  (D.I. 53, Ex. C-1 at COPYP0000076 (emphasis

in original)).  And the PTO relied on applicants' synonymous use of the terms, stating in its

decision overturning the examiner's rejections that:

> **In some manner, each of these independent claims requires** that a request from a
> client and/or source of an access request be sent either to a server or some other receiving
> element, which in turn sends cryptographically protected or otherwise protected copies of
> information to the respective clients or source of the access request, **all protected under
> the control of a broadly recited 'program portion.'**

(D.I. 53, Ex. C-1 at COPYP0000076 (emphasis added)).  Thus, the claim language and intrinsic

evidence make clear that "program" and "program portion" have the same meaning in the

context of the asserted claims, and that meaning is the express definition applicants presented to

the PTO:  "a set of instructions forming a single entity, defined independently of the processing

environment in which the instructions might eventually be executed."

   Moreover, claim differentiation does not dictate a different result, because that doctrine

"can not broaden claims beyond their correct scope, determined in light of the specification and

the prosecution history and any relevant extrinsic evidence."  *Multiform Desiccants, Inc. v.*

*Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) (holding that different terms in two

independent claims had the same scope because the written description and prosecution history overcame the presumption created by claim differentiation).

**B.** **"Selectively controlling access to" (claim 1) / "suppress" (claim 9) / "restrict[ing] or prevent[ing]" (claims 10, 11, 19, and 25) "copy or save functions at the client in respect of the data in its unprotected form"**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form (claim 1) | disabling functionality to copy or save the unprotected data that would otherwise be available at the client | disabling or enabling the user's ability to copy or save decrypted data |
| suppress client computer copy or save functions with respect to the unprotected copy of the requested data (claim 9) | suppress functionality to copy or save the unprotected data that would otherwise be available at the client | suppress the user's ability to copy or save decrypted data |
| restricting or preventing access to copy or save functions at the client in respect of the data in its unprotected form (claims 10, 25) | restricting or preventing functionality to copy or save the unprotected data that would otherwise be available at the client | restrict or prevent the user's ability to copy or save decrypted data |
| restrict or prevent client computer copy or save functions with respect to the unprotected copy of the requested data (claims 11, 19) | restrict or prevent functionality to copy or save the unprotected data that would otherwise be available at the client | restrict or prevent the user's ability to copy or save decrypted data |

These asserted claims use these four slight variations to describe the concept of preventing a user from accessing pre-existing copy and save functions.  Claim 1 recites the phrase "selectively controlling access to," claim 9 recites "suppress," and claims 10, 11, 19, and 25 recite "restrict[ing] or prevent[ing] access to."  The parties' proposals differ on three key points:  1) whether "selectively controlling" should be construed to include *enabling* access to copy and save functions;  2) whether the constructions must reflect that the alleged invention

disables otherwise available functionality; and 3) whether "unprotected data," includes more than "decrypted."

### 1. Construing "selectively controlling access to" to include *enabling* copy and save functions runs counter to the purpose of the alleged invention and all intrinsic evidence

Both parties agree that "selectively controlling access to" includes disabling copy or save functions. Copy Protection, however, proposes that "controlling" also include *enabling* those functions. That construction has no support in the specification and contradicts the entire purpose of the '649 patent. The patent is titled "Copy Protection of Data." Its Abstract explains that the purpose of the invention is to "**prevent** unauthorized copying" of unprotected data by this method: "copying functions are selectively **disabled** in respect of the data." (D.I. 53, Ex. B at Abstract). Indeed, the patent includes no disclosure at all of *enabling* copy and save functions. Rather, the only embodiment disclosed in the specification is consistently and unambiguously directed to "disabling" those functions:

- "the program object being operative such that **no, or restricted, copy or save functions are offered to the user** in respect of the downloaded data in its unprotected form." (D.I. 53, Ex. B at 2:2-5[2] (emphasis added).

- "As a result of processing a Java applet, **the usual copy and save functions will not be presented to the user**, thereby providing security in respect of the unprotected data presented to the user." (D.I. 53, Ex. B at 2:21-24 (emphasis added)).

- "The **user cannot save or copy the image data**. Because the Java enabled browser is running an applet for the image data in region 12, the **functions of the right mouse button are disabled** for region 12. Therefore, if the user clicks the mouse with the right button, **no menu option is automatically provided for saving, copying** or printing the displayed data in region 12. The right mouse button function **is disabled** according to usual Java operation for applets as previously described." (D.I. 53, Ex. B at 9:1-9 (emphasis added)).

A construction of "selectively controlling access to" that includes *enabling* copy and save functions would be inconsistent with the specification, and would result in claims that do not

---

[2] A citation of 2:25 refers to column 2, line 25 of the '649 patent, D.I. 53, Ex. B.

read on the only embodiment it describes.  *See Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005) ("a construction that 'would not read on the preferred embodiment' would 'rarely if ever [be] correct.'" (quoting *Vitronics*, 90 F.3d at 1583-1584)).  Moreover, the specification does not reasonably convey to one skilled in the art that the inventors had possession of an invention that could *enable* copy or save functions at a client.  As a result, Copy Protection's proposal would render the claims invalid at least because the resulting claims would lack written description under 35 U.S.C. § 112.  *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (the single embodiment in the specification provided no indication that patentee had possession of an invention broader than that embodiment).

Likewise, the prosecution history provides no support for "enabling."  During prosecution, applicants, in every instance, characterized the "selectively controlling" limitation in the same way as the "restrict and prevent" and "suppress" limitations, arguing that all of those limitations recited "similar features."  (D.I. 53, Ex. C-2 at COPYP0000166 and COPYP0000168; *see also* D.I. 53, Ex. C-3 at COPYP0000046).  In fact, applicants distinguished a prior art reference, Dean, because rather than teaching how to disable copy and save functions, it taught a way to enable them by bypassing otherwise disabling restrictions:

> One skilled in the art would look upon the teachings of Dean merely as a way to **bypass the controls on access to copy and save functions** being provided at the client, not as a means to provide such controls. As such, **the teachings of Dean are in direct contrast to the objectives of the present invention**.

(D.I. 53, Ex. C-2 at COPYP0000168 (emphasis added)).  Thus, construing "selectively controlling access to" to include enabling copy or save functions would run counter to the specification and prosecution history.

    **2.    The body of these limitations should be construed as disabling "functionality to copy or save the unprotected data that would otherwise be available at the client"**

As noted above, the body of each of these limitations is virtually identical, reciting some variation of disabling[3] "copy or save functions at the client in respect of the data in its unprotected form."  The parties' proposals for the body are:

- **Copy Protection**:  "the user's ability to copy or save decrypted data;"

- **Netflix**:  "functionality to copy or save the unprotected data that would otherwise be available at the client."

Netflix's proposal would clarify that copy or save functions must be otherwise available on the client before they can be disabled.  This should not be a controversial construction.  Indeed, it is dictated by the plain language of the claims, each of which recites either disabling "client computer copy or save functions" or "copy or save functions at the client."  The applicants also emphasized it during prosecution:  "[I]n the present invention, it is the program portion (e.g., a Java applet) that is being used to restrict access to *functions that would otherwise be legitimately available at the client*…."  (D.I. 53, Ex. C-3 at COPYP0000270 (emphasis added)).  In order to disable a feature, that feature must already be present, i.e., otherwise available, on the client.

Similarly, the only embodiment described in the specification emphasizes the patent relates to disabling user-controlled copy and save functions otherwise available at the client.  Fig. 2 describes the normal operation of a web browser, which includes accessing copy and save functions using the right mouse button:

> If the user clicks the computer's mouse in the area of the displayed image 8, using the right mouse button, a **drop-down menu 9 is displayed which gives the user options including "save"**, to save the digital data corresponding to the gif file to the computer's hard disc or to some other storage location….

(D.I. 53, Ex. B at 4:53-58 (emphasis added)).  The alleged invention of the '649 patent is to use a

---

[3] This subsection uses "disabling" as shorthand for the terms discussed in the previous subsection.

Java applet to disable that pre-existing mouse functionality:

> Because the Java enabled browser is running an applet for the image data in region 12, **the functions of the right mouse button are disabled** for region 12. Therefore, if the user clicks the mouse with the right button, **no menu option is automatically provided for saving, copying or printing the displayed data** in region 12. The right mouse button function is disabled according to usual Java operation for applets as previously described.

(*Id*. at 9:2-9 (emphasis added)).  The proper construction of "copy or save functions at the client in respect of the data in its unprotected form" must reflect that the copy or save functionality cannot be disabled if the client does not have that functionality in the first place.

### 3.    "Unprotected data" is not limited to "decrypted."

Finally, Copy Protection's construction seeks to change the claim term "unprotected data" to "decrypted data."  However, there is no support for such a change.  While encryption is one method of protecting data, the specification also discusses several other methods, including integrity checking procedures such as hashing (*id.* at 1:60-62) and watermarking (*id.* at 7:25-29), both of which are the subject of dependent claims.  (*Id.* at claims 4 and 16).  The claim language is clear – the data must be *unprotected*, not merely *decrypted*.  Copy Protection's construction would improperly broaden the claims such that "unprotected" data could, in fact, still be protected by other methods even if it is decrypted.

Also, the term "converting the cryptographically protected data to an unprotected form" appears elsewhere in claims that recite the "selectively controlling" and similar limitations.  Netflix's proposal would keep the claim internally consistent, referring to "unprotected data," i.e., data in its unprotected form.  In contrast, Copy Protection's proposal would change "unprotected form" to "decrypted data," when the word decrypted is not used anywhere in the claims.  Changing that term only in these limitations would render the claims invalid under 35

10

U.S.C. § 112, as the term "decrypted data" would lack antecedent basis. *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1332 (Fed. Cir. 2007) (holding that "claim construction should not, of course, be blind to validity issues: 'claims should be so construed, if possible, as to sustain their validity.'") (citing *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)).  As a result, Copy Protection's construction should not be adopted.

**C.**  **"Determining a machine identifier of the client by analysing its hardware and/or its software configuration" (claim 18)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| determining a machine identifier of the client by analysing its hardware and/or its software configuration | scanning the arrangement of the hardware and/or software of the client to determine a machine identifier | ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier |

The only disagreement between the parties for this term is whether the construction should begin with "scanning the arrangement" (Netflix) or "ascertaining characteristics" (Copy Protection).  Netflix's proposal should be adopted because it is consistent with the specification and provides guidance as to the scope of the limitation, while Copy Protection's proposal has no support in the specification and would result in a virtually boundless claim.  The specification describes only one method of determining a machine identifier – using a program to scan the client computer:

- "At step R3, the **dogtag program is run in order to provide a machine identification code (MID)** which provides a substantially unique identification of the client.  The dogtag program **scans the client computer** both in terms of its hardware and software."  (D.I. 53, Ex. B at 10:12-14 (emphasis added)).

Simply put, there is no specification support or enabling disclosure for any method of determining the machine identifier other than scanning the client computer.

Copy Protection's proposal, "ascertaining characteristics," would potentially cover other,

unknown and unsupported methods of determining a machine identifier.  Such a construction would render the claim invalid under 35 U.S.C. § 112(a) as lacking enablement, and would also render the claim so indefinite as to violate 35 U.S.C. § 112(b), which is to be avoided where possible.  *MBO Laboratories,* 474 F.3d at 1332 (holding that "claim construction should not, of course, be blind to validity issues:  'claims should be so construed, if possible, as to sustain their validity.'"  (citing *Rhine*, 183 F.3d at 1345)).

**D.    "A server" (claims 1, 9, 10, 11, 19, 23, 25) and "a server computer" (claims 9, 11, 19, 23)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|--------------------------------|------------------------------------------|
| a server | one or more computers, each capable of performing all recited server-side steps | one or more processing devices that are capable of providing information by receiving and responding to requests |
| a server computer | one or more computers, each capable of performing all recited server-side steps | one or more computers that are capable of providing information by receiving and responding to requests |

The dispute over the construction of "a sever" is whether the claimed methods may be divided among a distributed network of specialized servers, or whether they must be performed by a single network of servers each configured to perform the required steps.  It is clear from the intrinsic evidence that a distributed network is beyond the scope of, and contrary to, the claimed invention.

The claims at issue here describe methods for protecting data "sent from **a server** to a client."  (*See*, *e.g.*, D.I. 53, Ex. B at claim 1).  The "Summary of the Invention" refers to "a server" performing the required steps.  (*Id*. at 1:50-2:20).  The written description of the invention similarly teaches that a single server is capable of performing all claimed server steps.  (*See*, *e.g.*, *id*. at Figs. 1, 5, 10, 11).  The sole embodiment utilizes a single server to perform all of

the recited steps.[4]  (*Id.* at 2:32-3:18; 3:20-50; 3:53-4:12; 5:12-6:22; 6:45-7:67; 9:1-11:23).  The

prosecution history is similarly consistent and demonstrates that applicants' single-server

teaching was deliberate.  In arguing that another term—"program portion"—was distinguishable

over the prior art, applicants emphasized the design advantages of an "unbroken chain" for

handling the data:

> The "same" program portion allows an unbroken chain of control from the time
> during which the data set is in a protected form (i.e. an encrypted form) to control
> during conversion (e.g., decryption) of the data set into an unprotected form and
> for as long as the data set remains in the unprotected form. The chain of control
> provided by the "same" program portion thus remains unbroken.

(D.I. 53, Ex. C-1 at COPYP000077).  A multi-server, distributed network would conflict with the

requirement of an end-to-end unbroken chain of control described by the patent and reinforced

by the applicant.

Courts that have considered similar claims and intrinsic evidence have consistently

construed "server" to require that each server perform or be capable of performing each and

every claimed server step.  For example, in *FotoMedia Technologies, LLC v. AOL, LLC*, 2009

WL 2175845 (E.D. Tex. July 21, 2009), "[t]he dispute between the parties concerning the

construction of 'a server' [wa]s whether the claimed systems and methods may include multiple

server computers, and whether steps recited in the claims can be divided among these server

computers."  *Id.* at *6.  Defendants argued that "a system which distributes processing of the

various claimed steps amongst multiple servers would be beyond the scope of the claims."  *Id.*

They also pointed out that the specification did not "suggest or teach the concept of a distributed

---

[4]   In contrast to any of the claims at issue here, the written description suggests the use of
specialized "watermark servers" to perform other functions "[i]n some situations, it may be
convenient to provide separate cryptographic servers and watermark servers so that the provision
of keys and watermarking can be performed as a separate service to a number of different web
servers."  ('649 patent, 11:9-13).  The inventors were thus aware of the difference between a
distributed network and a single network – they simply did not teach a distributed network for
any of the server-side steps or elements.

system anywhere," and that the figure in the specification showed a single server. *Id.* at *6 and n.1. The district court ruled that each server must be "capable of performing all of the recited steps. . ." and, therefore, construed "a server" to mean "one server computer." *Id.* at *6-7.

Similarly, in *Zapmedia Servs., Inc. v. Apple, Inc.*, 2010 WL 8599970 (E.D. Tex. Aug. 19, 2010) *aff'd*, 482 F. App'x 533 (Fed. Cir. 2012), the patent-in-suit claimed "a server comprising" 1) "a user account corresponding to at least one user;" 2) "a server database application having at least references to a plurality of media asserts associated with the user account;" and 3) "a server application accessible over a network and capable of recognizing a plurality of media player devices as being authorized with the user account." *Id.* at *3. The magistrate construed "a server" to mean "one or more computers or devices on a network, with **each** computer or device having user account(s), server database application(s), and server applications." *Id.* Plaintiff argued the functionality could be fulfilled across a group of servers. *Id.* The district court disagreed, noting that "[o]n its face, [the asserted claim] requires 'a server,' *i.e.*, one or more servers, that include the recited limitations." *Id.*[5]

As in these cases, the intrinsic evidence and language of the claims requires that each claimed "server" must be capable of performing all recited server-side steps.

### E.   "Cryptographically protecting the data" (claims 1, 10, and 25) and "sending the cryptographically protected data to the client" (claims 1, 10, and 25)

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|--------------------------------|----------------------------------------|
|      |                                |                                        |

---

[5] A similar issue also arose in *MasterObjects, Inc. v. Google, Inc.*, 2013 WL 2319087 (N.D. Cal. May 28, 2013) *reconsideration denied*, 2013 WL 4532385 (N.D. Cal. Aug. 26, 2013), *aff'd*, 582 F. App'x 893 (Fed. Cir. 2014) and *aff'd*, 582 F. App'x 893 (Fed. Cir. 2014). There, the parties disputed whether the construction of "session" should include the limitation "single server" as opposed to a broader "server system." *MasterObjects*, 2013 WL 2319087 at *8-10. The district court construed "session" to mean "a related set of communications between a client and a single server in which the server recognizes when consecutive requests originate from the same client." *Id.* at *10.

14

| Cryptographically protecting the data | cryptographically protecting the data at the server | protecting the data by encryption and/or by an integrity checking procedure. |
|---|---|---|
| sending the cryptographically protected data to the client | sending the cryptographically protected data from the server to the client | sending the cryptographically protected data to the client (no need to construe) |

These terms appear in method claims for "protecting data sent from a server to a client." These claims, like every claim in the patent, cover an architecture of two devices: the server and the client. The dispute between the parties is whether these two steps (cryptographically protecting the data and sending it to the client) are performed at the server or at the client. Logically, these steps cannot be performed at the client. They must be performed at the server.[6]

Taking claim 1 as an example, the method of "protecting data sent from a server to a client" comprises four steps. Steps (a) and (d) are expressly performed "at the client":

> (a) running a program portion **at the client**, the program portion generating and uploading to the server a request for access to data;
> (b) cryptographically protecting the data;
> (c) sending the cryptographically protected data to the client; and
> (d) after the running of the program portion has begun and under control of the program portion **at the client**, converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions **at the client** in respect of the data in its unprotected form.

The other two steps must be performed at the server. Step (b) is performed at the server in the sole embodiment. (*See* D.I. 53, Ex. B at Figs. 3, 5). Step (c) is also performed at the server in the sole embodiment (*Id*. at Fig. 5) as well as in the preamble of the claims: "A method of protecting data **sent from a server** to a client." The combination of Figures 5 and 6 further show that data resides on the server in unprotected form, and is encrypted on the server, after a download is requested by the program portion.

---

[6] Moreover, as explained in Section D (supra), these steps must be performed by the same server or by servers each configured to perform both steps.



(*See id.* at request for files at Step 8 of Fig. 5, followed by Step 10 (illustrated in detail in Fig. 6 showing file encrypted at server, then downloaded)).

The specification discloses no other location where these steps could be performed. And because step (c) involves sending the data "to the client," step (c) must be performed at the server. Finally, because the cryptographically protected data cannot be sent to the client until it is cryptographically protected, predicate step (b), must logically be performed before step (c), and must therefore also be performed at the server.

### F.    **"A request for access to data" (claims 1 and 10)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|-------------------------------|----------------------------------------|
| a request for access to data | a request for permission to receive data from the server | A request to receive data |

The parties dispute whether "a request for access to data" means a "request to receive data," or a "request **for permission** to receive data." It is evident that requesting "access to"

something requires more than simply requesting it.  The patentee understood this, and where it wanted to say that the client was sending a request to receive data, did not use the term "access." (*See*, *e.g.*, D.I. 53, Ex. B at claim 20 ("A method as in claim 19, wherein the program running at the client generates and uploads **a request for data** from the client to the server …") (emphasis added)).  This is strong evidence that, consistent with the ordinary meaning of "request for access," the term should be construed as "a request for permission to receive data."  *See Phillips*, 415 F.3d at 1314-15 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

Further, for the same reasons as discussed above in Section III.E, the term should be construed as requiring that the request be for permission to receive the data **from the server** (as opposed to from the client or from somewhere else).

### G.     Order of Steps (Claims 1, 10, 25)

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|-------------------------------|----------------------------------------|
| Order of steps | The steps of claim 1 must be performed in order.  The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting," step, and the "converting" step must be performed after the "sending" step. | Do not agree that all steps of claim 1 must be performed in the order listed.<br><br>Agree that for claim 1, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step. |
| Order of steps | The steps of claim 10 must be performed in order.  The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting" step, and the "converting" step must be performed after the "sending" step. | Do not agree that all steps of claim 10 must be performed in the order listed.<br><br>Agree that for claim 10, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the |

| | | cryptographically protected data" step. |
|---|---|---|
| Order of steps | The steps of claim 25 must be performed in order. The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting" step, the "converting" step must be performed after the "sending" step, and the "restricting" step must be performed after the "converting" step | Do not agree that all steps of claim 25 must be performed in the order listed. Agree that for claim 25, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step. |

Copy Protection agrees that most of the steps in these claims have to be performed in the recited order. The only dispute is whether the first and second steps can be performed out of order. "A claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." *Mformation Technologies, Inc. v. Research in Motion Ltd.,* 764 F.3d 1392, 1398-99 (Fed. Cir. 2014) (internal quotations and citations omitted). Here, logic, grammar, and the specification all require the ordering of steps.

### 1.    The Steps Are Written in a Logical Order

Although the Federal Circuit has never addressed the issue, district courts have ruled that where the majority of the steps of a method claim must be performed in the recited order, the logical construction of the claim is that all the steps must be performed in that order. In *Aerotel, Ltd. v. Telco Group, Inc.*, 2010 WL 1916015, at *6-8 (S.D.N.Y. May 10, 2010), *aff'd in part*, *vacated in part on other grounds, Aerotel, Ltd. v. Telco Group, Inc.*, 433 Fed. Appx. 903 (Fed. Cir. 2011), the parties disputed whether the claimed method required that the steps be performed in the recited order. The district court noted that "[l]ogically, most but not all of the steps in [the asserted claim] must be performed in the order in which they are recited." *Id.* at *6. The district

18

court found that "[t]he significant degree to which the claims are logically sequential supports a construction requiring that all of the steps must be performed in order." *Id.*

Similarly, in *Michael S. Sutton Ltd. v. Nokia Corp.*, the district court ruled that the plain language of the asserted claim constituted "logically progressive language [that] alone provides a strong indication that the steps must be performed in the recited order." 647 F. Supp. 2d 737, 743 (E.D. Tex. 2009), *aff'd,* 2010 WL 5230901 (Fed. Cir. 2010) ("The steps are clearly written in a logical order. For instance, step (1) of claim 1 calls for analyzing a message. Step (2) then assumes that the message has been analyzed to determine if it was a data message. Furthermore, the substeps of step (2) follow the same logical progression requiring the 'analysis' in step 2(a) before step 2(b) can be performed.")

The language of Claim 1 of the '649 patent follows the same logical progression as the claims in these cases – step (a) calls for requesting data, step (b) calls for cryptographically protecting it, step (c) calls for sending it to the client, and step (d) calls for converting it to an unprotected form and selectively controlling access to it. Copy Protection concedes that step (b) must precede step (c), and that (c) must precede step (d). Logic and grammar dictate that step (a) must precede them all.

### 2.    The Specification Directly and Implicitly Requires an Order of Steps

In a non-precedential decision, the Federal Circuit has held that a method claim could be construed to require that the steps be performed in a certain order where that order was the only one disclosed in the specification's sole embodiment. *Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865 (Fed. Cir. 2008). In that case, the claims were directed to a method of treating sleep apnea with a medical device, and the district court construed the term "selected higher and lower pressure magnitudes" in step one to require the pressure magnitudes to be selected prior to the other steps in the sequence. *Id.* at 870. The Federal Circuit concluded that the prosecution

history and the only embodiment in the specification disclosed "preselection of higher and lower pressure magnitudes" and affirmed the district court's ruling that the selection step must occur prior to the remaining recited steps of the claimed method. *Id.* (citing *Loral Fairchild Corp. v Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999) ("Although not every process claim is limited to the performance of its steps in the order written, the language of the claim, the specification and the prosecution history support a limiting construction in this case.").

Similarly, the specification of the '649 patent – including the Figures that illustrate the method – discloses only one embodiment. (D.I. 53, Ex. B at 3:22-24; 3:54-545). In that embodiment, the program portion uploads to the server a request for access to data before the server cryptographically protects the data. Specifically, first the applet (program portion) generates and uploads to the server the BTC file request (request for access to data). (*Id.* at 7:1-3). This step is depicted in step S8 of Figure 5. Then, after the server performs the authentication step, the server encrypts the data as part of step S10, specifically at step S10.4. (*Id.* at 7:53-56). This is depicted in Figure 6, which provides more detail regarding step S10. The prosecution history is also uniform in describing the steps as being performed in the recited order. (*See, e.g.*, D.I. 53, Ex. C-1 at COPYP0000069-COPYP0000072; C-2 at COPYP0000157-COPYP0000160). The claimed method thus can only cover this sole disclosed embodiment, and the claim limitations must be performed in the claimed order. *Respironics*, 303 Fed. Appx. at 871-872.

## IV.    CONCLUSION

Because Netflix's proposed constructions are drawn exclusively from the language of the claims and the intrinsic evidence, the Court should adopt Netflix's proposed constructions.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Clay C. James
C. Matthew Rozier
Aaron S. Oakley
HOGAN LOVELLS US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel:  (303) 899 7300

Melissa J. Baily
James D. Judah
Adam Botzenhart
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
Tel:  (415) 875-6600

Dated:  May 22, 2015
1190730 / 41572

By:   _/s/ Bindu A. Palapura_____
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Bindu A. Palapura (#5370)
        Stephanie E. O'Byrne (#4446)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, DE  19801
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com
        bpalapura@potteranderson.com
        sobyrne@potteranderson.com

*Attorneys for Defendant Netflix, Inc.*