**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| COPY PROTECTION LLC, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 14-cv-365-LPS |
| v. | : | |
| | : | |
| NETFLIX, INC, | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| Defendant(s). | : | |
| | x | |

## <u>COPY PROTECTION'S OPENING CLAIM CONSTRUCTION BRIEF</u>

Date: May 22, 2015

Jonathan A. David (admitted *pro hac vice*)
Stephen F. Roth (admitted *pro hac vice*)
Aaron S. Eckenthal (admitted *pro hac vice*)
Maegan A. Fuller (admitted *pro hac vice*)
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
Tel: (908) 654-5000
Fax: (908) 654-7866
JDavid@ldlkm.com
SRoth@ldlkm.com
AEckenthal@ldlkm.com
MFuller@ldlkm.com
Litigation@ldlkm.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff Copy Protection LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................i

I.      INTRODUCTION .................................................................................................1

II.     OVERVIEW OF THE '649 PATENT...................................................................1

III.    PRINCIPLES OF CLAIM CONSTRUCTION ....................................................2

IV.     CLAIM CONSTRUCTIONS FOR THE DISPUTED TERMS ...........................3

        A.      "program" / "program portion"................................................................3

                1.      Ordinary Meanings ......................................................................3

                2.      Netflix's Constructions Violate Basic Claim
                        Construction Rules.......................................................................5

                3.      There Was No Clear And Unmistakable Disavowal ...................6

        B.      "selectively control access to" / "suppress" /  "restrict or
                prevent access to" . . . "copy or save functions".....................................9

        C.      "determining a machine identifier of the client …".................................11

        D.      "a request for access to data" ................................................................12

        E.      "cryptographically protecting the data".................................................14

        F.      "sending the cryptographically protected data to the client" ................16

        G.      "a server computer" / "a server" ..........................................................17

        H.      Order Of Steps (claims 1, 10, 25) .........................................................19

V.      CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

CASES

*Altris, Inc. v. Symantec Corp.*,
　318 F.3d 1363 (Fed. Cir. 2003)..................................................................................19

*In re Am. Acad. of Sci. Tech. Ctr.*,
　367 F.3d 1359 (Fed. Cir. 2004)....................................................................................8

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
　672 F.3d 1335 (Fed. Cir. 2012)....................................................................................5

*Bicon, Inc. v. Straumann Co.*,
　441 F.3d 945 (Fed. Cir. 2006)......................................................................................5

*CCS Fitness, Inc. v. Brunswick Corp.*,
　288 F.3d 1359 (Fed. Cir. 2002)....................................................................................2

*Epistar Corp. v. Int'l Trade Comm'n*,
　566 F.3d 1321 (Fed. Cir. 2009)....................................................................................7

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
　64 F.3d 1553 (Fed. Cir. 1995)......................................................................................5

*Grober v. Mako Prods., Inc.*,
　686 F.3d 1335 (Fed. Cir. 2012)....................................................................................7

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
　527 F.3d 1379 (Fed. Cir. 2008)....................................................................................3

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
　381 F.3d 1352 (Fed. Cir. 2004)...............................................................................8, 11

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
　381 F.3d 1111 (Fed. Cir. 2004)..................................................................................16

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
　177 F.3d 968 (Fed. Cir. 1999)......................................................................................5

*Phillips v. AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................2, 8

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
　242 F.3d 1337 (Fed. Cir. 2001)....................................................................................3

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
　299 F.3d 1313 (Fed. Cir. 2002)..................................................................................3, 7

*Thorner v. Sony Computer Entm't Am. LLC*,
　669 F.3d 1362 (Fed. Cir. 2012)................................................................................3, 12

*Vitronics Corp. v. Conceptronic, Inc.*,
　90 F.3d 1576 (Fed. Cir. 1996)......................................................................................2

## I.      INTRODUCTION

Copy Protection LLC ("Copy Protection") hereby provides its positions regarding the construction of disputed terms of U.S. Patent No. 7,079,649 ("the '649 Patent") identified in the Amended Joint Claim Construction Chart ("JCCC") (D.I. 53-1) filed on May 19, 2015.  Copy Protection's constructions are based on ordinary and customary meaning, consistent with the '649 Patent's specification and prosecution history.  Netflix, by contrast, time and again tries to read in limitations from examples, or non-disavowing statements from the prosecution, in an effort to unduly limit the claim scope and to ostensibly manufacture noninfringement defenses.

## II.     OVERVIEW OF THE '649 PATENT

The '649 Patent was filed in the U.S. on behalf of British Telecom and claims priority to an EP application filed on March 27, 1997.  The problem addressed by the inventors was how to protect copyrighted data from unauthorized copying with "particular application to protecting data transmitted through a network, such as hypermedia transmitted over a web-based network." ('649 Patent (D.I. 53-2) 1:6-10.)

The '649 Patent explains that, "[a]s well known in the art, HTML webpages can display text, graphics and files of other descriptions such as video images, animated graphics and audio samples" and that "[b]ecause of the ease with which the copyright work may be viewed, transmitted and copied on the web, it is difficult for a copyright owner to enforce its copyright." (*Id.* 1:32-34, 41-44.)  For example, "when a graphics file has been downloaded to a client, it may be readily copied onto the hard disc of a client's computer and replicated many times digitally, with no significant degradation from copy to copy."  (*Id.* 1l:44-48.)

To solve this problem, the '649 Patent explains:

With a view to overcoming this problem, the invention provides a method of copy protecting data sent from a server to a client for presentation to a user, comprising: cryptographically protecting the data; sending the cryptographically protected data to the client; and selectively controlling copying functions of the client in respect of the data

whilst the data is being held by the client in a form suitable for presentation to the user.

(*Id.* 1:52-59.)  The "data may be cryptographically protected by encryption and/or by an integrity checking procedure such as hashing."  (*Id.* 1:60-62.)

Copy Protection is the current owner of the '649 Patent and accuses Netflix of infringement by its streaming video data service whereby Netflix sends cryptographically protected data to the user and selectively controls the copy or save functions at the user's device with respect to the data in its unprotected form.  (*See* Compl. (D.I. 1) ¶¶ 11-12, 17-30.)

## III.  PRINCIPLES OF CLAIM CONSTRUCTION

The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.[1]  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  There are two exceptions: (1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments; the patentee must "clearly express [an] intent" to redefine the term.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).

The standard for disavowal of claim scope is exacting: "Where the specification makes

---

[1] The parties agree a person of ordinary skill would have at least a B.S. in electrical or computer engineering, computer science, or a similar discipline, as well as approximately three to four years of industry experience with client-server networks and some exposure to data security, web browsers and Hypertext Transfer Protocol ("HTTP").  (JCCC 1.)

clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). To import a claim limitation, clear and unmistakable disavowal of claim scope is required:

> It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer.

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).

## IV.    CLAIM CONSTRUCTIONS FOR THE DISPUTED TERMS

### A.    "program" / "program portion"

| "program" (claims 9, 11, 19, 23)[2] | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| sequence of instructions that can be executed by a computer | a set of instructions ==forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed== |
| "program portion" (claims 1, 10, 25) | |
| **Copy Protection's Construction** | **Netflix's Construction** |
| part of a program | a set of instructions ==forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed== |

### 1.    Ordinary Meanings

The term "program" (claims 9, 11, 19, 23) or the term "program portion" (claims 1, 10,

---

[2] Asserted claims in which the disputed terms appear are shown in parenthesis. Differences between the parties' claim constructions are also shown in ==yellow highlighting==.

25) appears in each independent claim of the '649 Patent.  The term "program" is clear, and was a well-known computer term at the time of filing in 1997.  "Portion" is also a well-known term. Neither "program" nor "program portion" were specially defined by the patentee.

Based on ordinary meaning, in the context of computers, a "program" is a "sequence of instructions that can be executed by a computer."  (*See* David Exh. 1,[3] *Microsoft Press Computer Dictionary* (3rd ed. 1997): program: "A sequence of instructions that can be executed by a computer"; David Exh. 2, *Barron's Dictionary of Computer and Internet Terms* (5th ed. 1996): program: "a set of instructions for a computer to execute.").  Netflix also agrees by its proposed construction that a "program" includes a "set of instructions" that can "be executed."

As to "program <u>portion</u>," the ordinary meaning of the word "portion" is part of a larger thing or a whole.  (*See* David Exh. 3, *American Heritage Dictionary* (3rd ed. 1992) (portion: "A section or quantity within a larger thing; a part of a whole").  Thus, the plain and ordinary meaning a "program portion" is simply a "<u>part of</u> a program."

The intrinsic evidence is consistent with these constructions.  For example, in the prosecution history, the patentee explained that a "Java applet" (a mini program or application run within a larger web browser program) was an example of a program portion: "But in the present invention, it is the <u>program portion (e.g., a Java applet)</u> that is being used to restrict access to functions that would otherwise be legitimately available at the client (e.g., provided via the Java subsystem)."  (JCCC Exh. C (D.I. 53-3 to 53-7), at COPYP00000270 (emphasis added).)  This was consistent with the examples in the specification for a "program object": "The <u>program object may comprise a Java applet</u> although the invention envisages the use of <u>other</u>

---

[3] "David Exh. __" refers to exhibits attached to the Declaration of Jonathan A. David.

program objects such as Active X or OLE." ('649 Patent 2:17-21 (emphasis added).)[4]  In both cases, the examples of smaller programs (*e.g.*, Java applets, Active X objects, OLE objects) that run within larger programs are consistent with Copy Protection's construction of a "program portion" being a "part of a program."

### 2.   Netflix's Constructions Violate Basic Claim Construction Rules

Netflix's constructions for "program" and "program portion" are not only confusing, but they violate basic claim construction canons.  First, Netflix construes "program" and "program portion" with exactly the same construction.  This "one-for-both" construction contravenes the doctrine of claim differentiation, where it is presumed that "different words or phrases used in separate claims…indicate that the claims have different meanings and scope."  *Karlin Tech., Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971-972 (Fed. Cir. 1999).  Here, "program" was used by the patentee in specific independent claims (clams 9, 11, 19, 23), while "program portion" was used in the remaining independent claims (claims 1, 10, 13, 22, 25, 26).  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.,* 672 F.3d 1335, 1349 (Fed. Cir. 2012) ("The fact that the two adjacent claims use different terms in parallel settings supports the district court's conclusion that the two terms were not meant to have the same meaning . . . .").

Netflix's constructions also violate the principle that a court should not ignore or "read out" claim terms that are expressly recited.  *See Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that "[w]e must give meaning to all the words in [the] claims") (citation omitted); *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir.

---

[4] Originally, the term "program object" was used in the '649 Patent.  During prosecution, in the claims, the patentee changed the term "program object" to "program portion."  (JCCC Exh. C, at COPYP00000262.)

2006) ("Claims are interpreted with an eye toward giving effect to all terms in the claim."). Netflix reads out the term "portion" when construing both claims terms to be the same.

### 3.   There Was No Clear And Unmistakable Disavowal

Netflix also attempts to unnecessarily narrow claim scope by inserting additional language into its construction (*i.e.*, "forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed").  To do so, Netflix will likely argue that the patentee limited the scope of these terms during prosecution. Netflix's additional language, however, is a partial quote taken from a statement made by the patentee in the December 1, 2003 Appeal Brief at page 10.   But when considering the full context of this statement made by the patentee, there was no clear and unmistakable disavowal of claim scope.

Specifically, in the full remarks on page 10 of the Appeal Brief, the only possible "disavowing" statements made about what independent claim 1 "required" were in sentences 1 to 3 below (*i.e.*, the first three "<u>requires</u>" sentences), and not in sentence 4 from which Netflix partially quotes (which is shown in **bold**):

> [1] Claim 1 further <u>requires</u> running a program portion at a client to generate and upload to the server a request for access to data. [2] Claim 1 also <u>requires</u> that this same program portion convert the cryptographically protected data to an unprotected form and selectively control access to copy or save functions of the data in its unprotected form. [3] Claim 1 therefore <u>requires</u> that the same program portion generates and uploads a request for access to data and performs conversion of the cryptographically protected data to an unprotected form. [4] The "same" program portion forms **a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed** (although when they are executed, it would be in the context of the instructions being part of a single entity). [5] The same program portion may be downloaded (see, e.g., dependent claim 7) as a whole, not fragmented and executed piecemeal. [6] The "same" program portion allows an unbroken chain of control from the time during which the data set is in a protected form (i.e. an encrypted form) to control during conversion (e.g., decryption) of the data set into an unprotected form and for as long as the data set remains in the unprotected form. [7] The chain of control provided by the "same" program portion thus remains unbroken.

6

(JCCC Exh. C, at COPYP0000077 (emphasis added).)

Indeed and unremarkably, by its express language, independent claim 1 does require what is stated in sentences 1-3.  Namely, claim 1 requires (and claims): [1] "running a program portion at the client," [3] "the program portion generating and uploading to the server a request for access to data"; and [2] "and under control of <u>the</u> program portion at the client converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form."  Thereafter, there is no clear disavowal in sentences 4 to 7.  Sentences 4 to 7 are merely explanatory, not mandatory, and do not include the "requires" language used in the first three sentences.

There is certainly no unmistakable disclaimer in sentences 4 to 7, but merely what <u>might</u> or <u>may</u> result or be <u>allowed</u> by virtue of the required/claimed steps (*e.g.*, "the instructions *might* eventually be executed," "the same program portion *may* be downloaded," "[t]he 'same' program portion *allows* an unbroken chain of control").  *See Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341-43 (Fed. Cir. 2012) (statements made by the patentee during prosecution "did not define or limit, let alone clearly and unmistakably disclaim, claim scope"); *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (even direct criticism of a particular technique did not rise to clear disavowal).  Sentences 4 to 7 thus do not "demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by . . . expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex,* 299 F.3d at 1325.

Moreover, Netflix suspiciously cherry picks only a partial quote from sentence 4 and omits other quotes from sentences 5-7.  Indeed, in its partial quote of sentence 4, Netflix leaves out that when the program portion instructions are executed, it would be in the context of the instructions being part of a single entity.  In other words, the program portion could be run as a

part of a larger program, such as the examples in the patent of a Java applet or Active X object running in a web browser.

Finally, the partial statement in sentence 4 does not appear anywhere in the specification, and thus this limited statement found only in the prosecution history (and contrasted with the "required" statements of sentences 1-3) does not present the type of case where clear and unmistakable statements about the invention were made.  *See In re Am. Acad. of Sci. Tech. Ctr*., 367 F.3d 1359, 1365-67 (Fed. Cir. 2004) (finding the specification as a whole did not express a clear disavowal of that subject matter); *see also Phillips*, 415 F.3d at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").  Thus, Netflix's construction should be rejected and the patentee should be entitled to the full scope of "program" and "program portion."  *See Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").[5]

---

[5] Even if disavowal occurred from the partial quote Netflix relies upon, it would only be as to the "program portion" claims, which were expressly distinguished by the patentee in the Appeal Brief from the "program" claims.  Namely, the partially quoted statement was made in the Appeal Brief (at p.10 ll.12-14) within the specified page range (at p.10 l.6 to p.11 l.15) that applied only to claims reciting "program portion."  (JCCC Exh. C, at COPYP0000046-47.)

**B.** **"selectively control access to" / "suppress" /**
**"restrict or prevent access to" . . . "copy or save functions"**

| selectively control[ling] access to copy or save functions at the client in respect of the data in its unprotected form (claim 1) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| disabling or enabling the user's ability to copy or save decrypted data | disabling functionality to copy or save the unprotected data that would otherwise be available at the client |

| suppress client computer copy or save functions with respect to the unprotected copy of the requested data (claim 9, 23) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| suppress the user's ability to copy or save decrypted data | suppress  functionality to copy or save the unprotected data that would otherwise be available at the client |

| restrict[ing] or prevent[ing] access to copy or save functions [at the client] in respect of the data [set when] in its unprotected form  (claims 10, 25) / restrict or prevent client computer copy or save functions with respect to the unprotected copy of the requested data (claim 11, 19) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| restrict or prevent the user's ability to copy or save decrypted data | restrict[ing] or prevent[ing] functionality to copy or save the unprotected data that would otherwise be available at the client |

Each independent claim includes that the program or program portion <u>selectively controls</u> or <u>suppresses</u> or <u>restricts or prevents</u> the user's ability to copy or save the data after the data is decrypted.  As the PTO explained in its Decision on Appeal:

In some manner, each of these independent claims requires that a request from a client and/or source of an access request be sent either to a server or some other receiving element, which in turn sends cryptographically protected or otherwise protected copies of information to the respective clients or source of the access request, all protected under the control of a broadly recited "program portion" which further controls the conversion of the cryptographically protected data or otherwise protected data to an unprotected form. This "program portion" also selectively controls access to copy or save functions in independent claims 1, 28 and 29, suppresses such functions in claims 30 and 34 and restricts or prevents access to such functions in independent claims 31, 32, 33, 35 and 36.

The environments depicted in . . . Spies fail to show or teach . . . the claimed selectively controlling access features or the suppression features or the restriction or preventing access features. Once the received information has been decrypted by the user by means of set top box 230 . . . Spies does not further disclose placing any restrictions on the copying of data once it is received by one of these terminal devices.

(JCCC Exh. C, at COPYP0000032-33.)

9

Copy Protection uses the ordinary meaning of the claim terms "selectively control" "suppress," and "restrict or prevent" in connection with copying or saving, which is consistent with the specification and prosecution history. For example, the specification explains:

> [T]he invention provides a method of copy protecting data sent from a server to a client for presentation to a user, comprising: . . . <u>selectively controlling</u> copying functions of the client in respect of the data whilst the data is being held by the client in a form suitable for presentation to the user. ('649 Patent 1:52-59 (emphasis added).)

> When displayed by the client, storing and copying functions are <u>selectively disabled</u> in respect of the data, in order to prevent unauthorized copying. (*Id.* Abstract (emphasis added).)

> [T]he program object being operative such that <u>no, or restricted</u>, copy or save functions are offered to the user in respect of the downloaded data in its unprotected form. (*Id.* 2:2-5.)

> Many modifications and variations fall within the scope of the invention. For example, the running of the applet A1 may be modified . . . in order to provide a <u>restricted</u> set of functions when operating the right mouse button on the display area 12. (*Id.* 9:35-40.)

The prosecution history is similar. In overcoming the prior art, the patentee explained:

> Spies fails to teach or suggest all of the claimed limitations. For example, Spies fails to teach or suggest <u>selectively controlling access to copy or save functions</u> at the client in respect of data in its unprotected form, as required by independent claims 1, 28-29 and 35. Independent claims 30-34 and 36 require similar limitations. Spies fails to teach or suggest <u>restricting or preventing access to copy or save functions</u> of data in its unprotected form as required by independent claims 31-33 and 36 <u>or suppressing client computer copy or save functions</u> with respect to an unprotected copy of the requested data as required by independent claims 30 and 34.

(JCCC Exh. C, at COPYP000073-74 (emphasis added).) The PTO allowed the claims, noting that "there is no teaching of <u>selectively controlling access to copy or save functions, or suppressing client computer copy or save functions or restricting or preventing client copy or save functions</u> required in the respective independent claims on appeal." (JCCC Exh. C, at COPYP000033 (emphasis added).)

Netflix again tries to import a limitation into its constructions where there has been no clear disavowal of claim scope, reading into the language "data <u>that would otherwise be</u>

available at the client" in all its constructions.   This appears to be an attempt to create a noninfringement argument that Netflix does not allow the client an "option" to copy or save the program.

Regardless of motive, it seems that Netflix is importing this limitation from a discussion in the prosecution history where the patentee used the words "otherwise available" in explaining that, in the cited Netscape prior art, copy and save functions were available at the client but that the invention could suppress access to those functions:

> However, in Netscape, copy and save functions <u>are</u> exported to the Java subsystem and would hence be available to Java applets running on a client unless, as in the present invention, some additional functionality is provided to suppress access to such functions which are otherwise available in respect to particular data sets.   (JCCC Exh. C, at COPYP00000168.)

This statement is not a clear disavowal of claim scope and merely explains that in the Netscape prior art, there was no suppressing of access to copy or save functions at the client.[6]   *See Home Diagnostics,* 381 F.3d at 1358 (noting that without clear disavowal, "the patentee is entitled to the full scope of its claim language").   Thus, Netflix's constructions should be rejected.

> ### C.        "determining a machine identifier of the client …"

| determining a machine identifier of the client by analyzing its hardware and/or its software configuration (claim 18) | |
| --- | --- |
| **Copy Protection's Construction**<br>ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier | **Netflix's Construction**<br>scanning the arrangement of the hardware and/or software of the client to determine a machine identifier |

Copy Protection construes "determining" in this claim element consistent with its ordinary meaning.   (*See* David Exh. 3, *American Heritage Dictionary* (3rd ed. 1992): determine: "2. To establish or ascertain definitely, as after consideration, investigation, or calculation.")  By

---

[6] Moreover, any purported disavowal by this statement would only apply to the "suppress" claim terms.

contrast, Netflix reads in a specific "scanning" requirement from an <u>example</u> in the '649 Patent

where the determining of a machine identifier is done via a "dogtag program" typically provided

to a client on an optical disc which is then run to "scan" the client's computer:

> <u>An example</u> of how an individual key can be provided, will now be described with reference to FIGS. 10 and 11. . . . At step R1, the client 3 contacts the web server 1 with a request to become registered for the copyright protection scheme. <u>The web server 1, at step R2 provides the client with a program referred to herein as a dogtag</u>. The dogtag is typically provided on a compact optical disc (CD), possibly in combination with other software, e.g. for shopping over the Internet or a micropayment scheme. . . .
>
> At step R3, the dogtag program is run in order to provide a machine identification code (MID) which provides a substantially unique identification of the client. <u>The dogtag program scans the client computer</u> both in terms of its hardware and software.

('649 Patent 9:61-10:14 (emphasis added).)  "Scanning" by a program is one example of how to

determine a machine identifier of the client, and claim 18 was written in the broader language of

"determining."  There has been no clear disavowal of the full scope of this step, and thus

Netflix's construction should be rejected.  *See Thorner*, 669 F. 3d at 1367 ("The patentee is free

to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning

unless the patentee explicitly redefines the term or disavows its full scope.").

> ### D.    <u>"a request for access to data"</u>

| a request for access to data (claim 1, 10, 25) / a request for access to a data set (claim 22) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| a request to receive data | a request <mark>for permission</mark> to receive data <mark>from the server</mark> |

Copy Protection's construction is based on plain meaning and how the claims and

specification distinguish between the client simply requesting access to the data, and the client

requesting permission to receive data.  Netflix, on the other hand, tries to improperly include a

request "for permission" limitation, which is an optional feature in the '649 Patent.

The '649 Patent differentiates between (1) the client requesting access to the data, and

(2) the client requesting "permission" to access the data, with the server authenticating that the

client has such permission to receive data.  The latter concept is an optional feature and not required by the independent claims, which were drafted more broadly.

For example, independent claim 1 requires only uploading a request by the client for access to the data (via the program portion), whereas dependent claims 5 and 18 require permission steps:

> 1. A method of protecting data sent from a server to a client, said method comprising: running a program portion at the client, <u>the program portion generating and uploading to the server a request for access to data</u>; . . . .

> 5. A method as in claim 1 including authenticating that the client is <u>permitted to receive the data</u>.

> 18.  A method as in claim 1 including . . . transmitting the unique determinator to the client, to be stored therein <u>for use subsequently in identifying the client to the server</u>, <u>to permit</u> encrypted data to be downloaded thereto from the server.

As explained in the '649 Patent, permission and authentication are optional if one wants to first ensure the data is downloaded by an "authenticated client":

> An authentication procedure <u>may</u> be employed to ensure that the cryptographically protected data is only downloaded to an authenticated client. The authentication process <u>may</u> be performed by reference to a payment scheme, to enable a royalty to be collected in respect of the downloaded, cryptographically protected data.  (*Id.* 2:32-34 (emphasis added).)

Still further, a client can optionally be permitted or authenticated to receive the data even without making a <u>request</u> for permission, such as upon making a payment:

> The authentication may be carried out in a number of different ways. For example, the server may only download the file if the client has made a payment, so as to allow the owner of the copyright of the BTC file to collect a royalty for the act of viewing the file. (*Id.* 7:6-10)

Moreover, independent claims 1, 10 and 25 logically do not include a requirement of requesting <u>permission</u> to receive the data.  If requesting permission were required, the server could not send the data in accordance with these claims (which all call for "sending the cryptographically protected data to the client") unless permission or authentication were granted.

Thus, Netflix's construction contradicts the express claim language of these claims.

Finally, the patentee expressly claimed the concept of "permission" in other independent claims (*i.e.*, clams 10, 13, 22, 25, and 26), but only in relation to access to the program portion and not the data: "after access to the program portion is <u>permitted</u> . . . ."  In other words, when the patentee wanted to include limitations about "permission," it did so explicitly.

Thus, the independent claims in which the phrase "request for access to data" appears do not require the client to request "permission" to receive the data as Netflix contends.

E.  <u>"cryptographically protecting the data"</u>

| cryptographically protecting the data (claim 1, 10, 25) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| protecting the data by encryption and/or by an integrity checking procedure | cryptographically protecting the data <mark>at the server</mark> |

Copy Protection's construction follows from the intrinsic evidence of the claim language and the discussions in the patent's specification, which show that, as used in the '649 Patent, "cryptographically protecting the data" encompasses both (a) protecting the data by encryption and (b) protecting the data by an integrity checking procedure (such by hashing).

Dependent claims 2 and 3 expressly support Copy Protection's construction that "cryptographically protecting" covers both encryption and integrity protection of the data:

2. A method as in claim 1 wherein <u>cryptographically protecting</u> the data comprises protecting the data by <u>encryption</u>.

3. A method as in claim 1 wherein <u>cryptographically protecting</u> the data comprises <u>protecting the integrity of the data cryptographically</u>.

In the specification, the '649 Patent explains: "The data may be <u>cryptographically protected</u> by <u>encryption</u> and/or by <u>an integrity checking procedure</u> such as hashing." (*Id.* 1:59-62 (emphasis added).)  The example shown in Figure 6 in the patent also provides that hashing the data (a type of integrity protecting) can occur first (step S10.3) and then encryption (step S10.4). (*Id.* 7:39-64, Fig.6.)  Finally, the Abstract states: "The downloaded data is cryptographically

protected, by encryption and hashing." (*Id.* Abstract.)

Netflix's construction, on the other hand, is unclear and seems to require that an <u>act</u> of cryptographically protecting the data be done <u>at the server</u>. But there is no such requirement in independent claims 1, 10, or 25 or based on any statements made in the prosecution history. By contrast, when the patentee wanted to specify <u>where</u> a step occurred, it did so explicitly, as shown for example in independent claim 1 (underlining showing where the event occurs):

1. A method of protecting data sent from a <u>server to a client</u>, said method comprising:

running a program portion <u>at the client</u>, the program portion generating and uploading <u>to the server</u> a request for access to data;

cryptographically protecting the data;

sending the cryptographically protected data <u>to the client</u>; and

after the running of the program portion has begun and under control of the program portion <u>at the client</u>, converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form.

Thus, the <u>act</u> of cryptographically protecting the data need not occur "at the server," as the data could already be cryptographically protected beforehand and then placed on the server.

The specification does not require "a server" or "the server" to engage in an <u>act</u> of cryptographically protecting the data. In fact, it discusses the use of encrypted data without requiring where or when that encryption initially occurred:

The data may be cryptographically <u>protected by encryption . . . .</u> (*Id.* 1:60-62 (emphasis added).)

More specifically, the method according to the invention may include . . . running the program object on the client such that a request is uploaded to the server for <u>a file containing the cryptographically protected data</u>, downloading the file to the client, …. (*Id.* 1:63-67 (emphasis added).)

The invention furthermore includes a method of downloading <u>encrypted data</u> from a server to a client, . . . to permit <u>encrypted data to be downloaded thereto from the server</u> . . . . (*Id.* 2:55-65 (emphasis added).)

The data to be displayed in region 12 <u>is cryptographically protected</u> so that it cannot be

readily deciphered . . . . In this example, the cryptographic protection includes <u>encryption of the downloaded data . . .</u> . (*Id.* 6:54-59 (emphasis added).)

Furthermore, using a server to encrypt the data is only an "example" given in the patent, which states that in one "<u>example</u> of a downloading process in accordance with the invention" (*id.* 5:60-62 (emphasis added)), the server can encrypt the data using an encryption algorithm and a cryptographic key previously downloaded to the client:

> As step S10.4 the data is encrypted <u>at the server 1</u>, using a copy of the algorithm EA and the key $K_E$ which were downloaded previously to the client, in the Java bytecodes of applet A1. (*Id.* 7:53-56 (emphasis added).)

Accordingly, the Court should adopt Copy Protection's construction which follows the specification and claim's use of the phrase "cryptographically protecting" and does not read in an example from the specification. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("And, even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (citations and internal quotation marks omitted)).

### F. **"sending the cryptographically protected data to the client"**

| sending the cryptographically protected data to the client (claim 1, 10, 25) ||
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| sending the cryptographically protected data to the client (no need to construe) | sending the cryptographically protected data ==from the server== to the client |

Here, the plain language of the claim element should control and no construction is needed. But rather than go with the plain language, Netflix is trying to read in a requirement that the data sent to the client comes from "<u>the</u> server" ⸺ which perhaps is meant to require that the same server that receives the request for the data also sends the protected data to the client. While this is an exemplary embodiment,[7] it is not required by the claim language, which was

---

[7] The '649 Patent states an "example of a downloading process in accordance with the invention

*(continued)*

drafted broader in independent claims 1, 10, and 25, and there was no clear intention to limit the clam scope using words or expressions of manifest exclusion or restriction.

Independent claim 1, for example, expressly delineates that the "the server" is only involved in the first step:

> 1. A method of protecting data sent from a server to a client, said method comprising:
>    running a program portion at the client, the program portion generating and uploading to the server a request for access to data; . . . .

By contrast, the claim does not require sending the cryptographically protected data from the server to the client as Netflix contends; it only requires "sending the cryptographically protected data to the client."  The same is true for independent claims 10 and 25.

Accordingly, Netflix's claim construction should be rejected as trying to read in an exemplary embodiment in view of claim language that was drafted more broadly.

G.      "a server computer" / "a server"

| a server computer (claims 9, 11, 19, 23) | |
|---|---|
| **Copy Protection's Construction** | **Netflix's Construction** |
| one or more computers that are capable of providing information by receiving and responding to requests | one or more computers, each capable of performing all recited server-side steps |
| a server (Claims 1, 9, 10, 11, 19, 23, 25) | |
| **Copy Protection's Construction** | **Netflix's Construction** |
| one or more processing devices that are capable of providing information by receiving and responding to requests | one or more computers, each capable of performing all recited server-side steps |

Copy Protection's constructions follow from the ordinary meaning of server in a computer context, namely one or more computers/devices capable of "serving" or providing information by receiving and responding to requests.  Copy Protection's constructions also

---

will now be described in more detail with reference to FIGS. 3, 4 and 5."  ('649 Patent 5:60-62.) Likewise, the patentee explained in the Appeal Brief that "[a]n exemplary embodiment of the present invention is described below" when providing a concise explanation of the invention in its appeal briefs during prosecution.  (*E.g.*, JCCC Exh. C, at COPYP00000157-160.)

distinguish between these two terms, with "server <u>computer</u>" including one or more <u>computers</u> and "server" including one or more <u>processing devices</u>.  For example, a server or a client might comprise processing devices not referred to as traditional or personal computers.[8]

While the parties agree that a server computer may comprise one or more computers, Netflix, tries to improperly add a requirement that the one or more computers are "<u>each</u> capable of performing <u>all recited</u> server-side steps."  Netflix's construction should be rejected for a number of reasons.  First, there is no requirement in the specification or prosecution history, or any clear disavowal, that "each" computer or device comprising the server must perform, or have an ability to perform, each of the steps that the server is required to perform.  Only the server as a whole needs to perform the required steps of the claims.  Multiple computers can form a server, as Netflix agrees by virtue of its constructions, and the preferred networking environment of the invention is the World Wide Web, which is made up of many servers capable of providing information by receiving and responding to requests:

> A copyright protection scheme downloads data from a server, typically over the World Wide Web to a client for presentation to a user.  ('649 Patent Abstract.)
>
> This invention relates to protecting data against copying and has particular application to protecting data transmitted through a network, such as hypermedia transmitted over a web-based network.  (*Id.* 11:6-9.)
>
> For example, the World Wide Web comprises many servers connected over the Internet in a web, which have addresses in the form of universal resource locators (URL). (*Id.* 11:19-21.)

Second, Netflix does not distinguish between these two terms and construes them as the same without regard to claim differentiation.  Third, Netflix's constructions are over inclusive.  The terms are only "server computer" and "server" and not what specific steps they must

---

[8] The '649 Patent explains that the "client may comprise a personal computer <u>or other processing device</u> capable of presenting the data retrieved from the server to a user." ('649 Patent 1:14-17 (emphasis added).)

perform.  Finally, it is unclear what Netflix means by "all recited server-side steps."  Netflix does not identify which steps are "server-side" and could be trying to inferentially include steps that are not required to be performed by the server.  Compare claim 1 ("cryptographically protecting the data") with claim 9 ("downloading a protected copy of requested data from a server to a client").  Thus, the Court should adopt Copy Protection's constructions.

### H.    Order Of Steps (claims 1, 10, 25)

Netflix finally tries to require that each step in independent claims 1, 10, and 25 be performed in the exact order listed.  Although some steps need to be performed before others from an antecedent basis, each step does not need to be performed in the exact listed order.

While steps described in a claim are usually not construed to require an order, there is an exception "when the method steps implicitly require that they be performed in the order written." *Altris, Inc. v. Symantec Corp*., 318 F.3d 1363, 1369 (Fed. Cir. 2003).  To determine if the steps implicitly require an order, the court first "look[s] to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written," and if not, the court "look[s] to the rest of the specification to determine whether *it* 'directly or implicitly requires such a narrow construction.'" *Id.* at 1369-70 (citations omitted).

Claim 1, by its use of words "the" and "after," shows which steps must precede others:

1. A method of protecting data sent from a server to a client, said method comprising:

    [1] running a program portion at the client, the program portion generating and uploading to the server a request for access to data;

    [2] cryptographically protecting the data;

    [3] sending the cryptographically protected data to the client; and

    [4] after the running of the program portion has begun and under control of the program portion at the client, [5] converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form.

19

Clearly, step 3 of sending <u>the</u> cryptographically protected data to the client must occur after step 2 of cryptographically protecting the data.   But there is no such constraint on step 1 occurring before step 2.   Step 2 could be done first and then step 1.   Either order provides the same result needed before step 3; namely, cryptographically protected data.   From an antecedent basis, step 5 of converting <u>the</u> cryptographically protected data at the client must also occur after step 3 of sending the cryptographically protected data.   Finally, step 4 self-defines when it occurs, which is "<u>after</u> running of <u>the</u> program portion" in step 1.

Thus, the only steps that must occur in order in claim 1 are: steps 1 and 2, in any order, step 2 before step 3; step 3 before step 5; and step 1 before step 4.   This equates to what the parties agreed to in the JCCC, *i.e.*, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step.

Independent claims 10 and 25 similarly use the words "the" and "after" just like independent claim 1, and for the same reasons, in these clams, the only requirement is that the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step.

## V.    <u>CONCLUSION</u>

Netflix's constructions improperly attempt to read limitations into the claims without evidence of clear and unequivocal disavowal of claim scope.   Copy Protection therefore respectfully requests the Court to adopt its proposed claim constructions.

Dated:  May 22, 2015

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
302) 777-0300
(302) 777-0301(Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Jonathan A. David (admitted *pro hac vice*)
Stephen F. Roth (admitted *pro hac vice*)
Aaron S. Eckenthal (admitted *pro hac vice*)
Maegan A. Fuller (admitted *pro hac vice*)
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
(908) 654-5000
(908) 654-7866 (Fax)
JDavid@ldlkm.com
SRoth@ldlkm.com
AEckenthal@ldlkm.com
MFuller@ldlkm.com
Litigation@ldlkm.com

*Counsel  for Plaintiff Copy Protection LLC*