## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COPY PROTECTION LLC,                     )
                                     )
    Plaintiff,             )     C.A. No. 14-365 (LPS)
    v.                     )
                                     )     **JURY TRIAL DEMANDED**
NETFLIX, INC.,                           )
                                     )
    Defendant.             )


## NETFLIX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Clay C. James
C. Matthew Rozier
Aaron S. Oakley
HOGAN LOVELLS US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel:  (303) 899 7300

Melissa J. Baily
James D. Judah
Adam Botzenhart
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
Tel:  (415) 875-6600

Dated:  June 19, 2015
1193311/ 41572

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendant Netflix, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT......................................................................................................1

     A.    "Program" (claims 9, 11, 19, and 23) and "program portion" (claims 1, 10, 22, and 25) ............................................................................................1

         1.    The proper construction of program portion is a "set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed."................................................................................1

         2.    The definitions of program and program portion are identical because Applicants used those terms synonymously and interchangeably. ...................................................................4

     B.    "Selectively controlling access to" (claim 1) / "suppress" (claim 9) / "restrict[ing] or prevent[ing]" (claims 10, 11, 19, and 25) "copy or save functions at the client in respect of the data in its unprotected form." ...................6

         1.    Construing "selectively controlling access" to include *enabling* copy and save functions runs counter to the purpose of the alleged invention and all the intrinsic evidence. .......................................7

         2.    The body of these limitations should be construed as disabling "functionality to copy or save the unprotected data that would otherwise be available at the client." .................................................8

         3.    There is no basis to construe "unprotected data" as "decrypted data." ........................................................................9

     C.    "Determining a machine identifier of the client by analysing its hardware and/or its software configuration" (claim 18)..........................................9

     D.    "A server" (claims 1, 9, 10, 11, 19, 23, 25) and "a server computer" (claims 9, 11, 19, 23) .............................................................................10

     E.    "Cryptographically protecting the data" (claims 1, 10, and 25) and "sending the cryptographically protected data to the client" (claims 1, 10, and 25) ............................................................................................13

     F.    "A request for access to data" (claims 1 and 10)..................................15

     G.    Order of Steps (Claims 1, 10, 25) .......................................................17

III.  CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aerotel, Ltd. v. Telco Group, Inc.*,
No. 1:04-CV-10292-RJH-FM, 2010 WL 1916015 (S.D.N.Y. May 12, 2010), *aff'd in part, vacated in part on other grounds, Aerotel, Ltd. v. Telco Group, Inc.*, 433 Fed. Appx. 903 (Fed. Cir. 2011)...................................................................................................18

*Edward H. Phillips v. AWH Corporation*
415 F.3d 1303 (Fed. Cir. 2005)..............................................................................13, 14

*FotoMedia Technologies, LLC v. AOL, LLC*,
No. 2:07-CV-255, 2009 WL 2175845 (E.D. Tex. July 21, 2009) ......................................11, 12

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir. 1997)..............................................................................14

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014)..............................................................................16

*In re Katz Interactive Call Processing Patent Litigation*,
639 F.3d 1303 (Fed. Cir. 2011)..............................................................................14

*MasterObjects, Inc. v. Google, Inc.*,
No. C11-1054 PJH, 2013 WL 2319087 (N.D. Cal. May 28, 2013) *reconsideration denied*, 2013 WL 4532385 (N.D. Cal. Aug. 26, 2013), *aff'd*, 582 F. App'x 893 (Fed. Cir. 2014)....................................................................................................12

*MBO Laboratories, Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)..............................................................................6, 10

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998)..............................................................................4

*Respironics, Inc. v. Invacare Corp.*,
303 Fed. Appx. 865 (Fed. Cir. 2008) ......................................................................20

*Springs Window Fashions LP v. Novo Indus., L.P.*,
323 F.3d 989 (Fed. Cir. 2003)..............................................................................2

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..............................................................................3

*Zapmedia Servs., Inc. v. Apple, Inc.*,
No. 2:08-CV-104-DF-CE, 2010 WL 8599970 (E.D. Tex. Aug. 19, 2010) *aff'd*, 482 F. App'x 533 (Fed. Cir. 2012)..............................................................................12

**STATUTES**

35 U.S.C. § 112 ................................................................................................................. 6

35 U.S.C. § 112(a) ............................................................................................................ 10

35 U.S.C. § 112(b) ............................................................................................................ 10

**OTHER AUTHORITIES**

*Random House Webster's College Dictionary* (2nd Ed. 1999) ........................................ 16

U.S. Patent No. 6,018,774 ................................................................................................. 11

## I.   INTRODUCTION

Netflix's proposed constructions are based on intrinsic evidence derived from the plain language of the claims, specification, and prosecution history.  Copy Protection's proposed constructions, in contrast, rely predominantly on extrinsic evidence that contradicts narrowing disclaimers made by the applicants in the specification and prosecution history, and its expansive constructions are against the weight of the intrinsic evidence and would confuse and mislead the jury.

## II.   ARGUMENT

### A.   "Program" (claims 9, 11, 19, and 23) and "program portion" (claims 1, 10, 22, and 25)

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|--------------------------------|----------------------------------------|
| program portion | set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed | part of a program |
| program | [same as program portion] | sequence of instructions that can be executed by a computer |

Copy Protection's constructions and arguments for "program" and "program portion" ignore the intrinsic evidence and, instead, rely on dictionary definitions and abstractions.  Indeed, Copy Protection's extensive reliance on extrinsic evidence highlights that there is nothing in the specification or prosecution history that supports giving "program portion" a different scope from "program."

> **1.   The proper construction of <u>program portion</u> is a "set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed."**

Copy Protection spends much of its opening brief trying to distance itself from the express definition of "program portion" applicants used to obtain the '649 patent over a USPTO

examiner rejection:

> Claim 1 therefore requires that the same program portion generates and uploads a request for access to data and performs conversion of the cryptographically protected data to an unprotected form. **The "same" program portion forms a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed** (although when they are executed, it would be in the context of the instructions being part of a single entity).

(D.I. 53, Ex. C-3 at COPYP0000077 (emphasis added)).  Although Copy Protection is correct that extrinsic evidence can be considered when construing a claim, it is improper where the intrinsic evidence unambiguously describes the scope of the patented invention. *Vitronics Corp.,* 90 F.3d at 1583.  As noted, the applicants offered the above definition specifically to avoid prior art cited by the USPTO examiner, evidencing a clear intent to define their invention in comparison to that art.  (D.I. 57 at pp. 3-4; *see also Springs Window Fashions LP v. Novo Indus., L.P.,* 323 F.3d 989, 995 (Fed. Cir. 2003) ("[t]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.  A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement."); *id.* ("In this case, a reasonable competitor, reviewing the amendments and statements made by the applicant to distinguish the claimed invention from [the prior art], would conclude that the claimed invention did not cover a device like [the prior art's].")).  The applicants' use of the verb "forms" also serves to emphasize that applicants were offering a claim definition; representing to the USPTO that the program portion "forms a set of instructions forming a single entity" is an unequivocal statement that the program portion "is" such a unified set of instructions.

Copy Protection argues that two sentences that follow the applicants' "single entity" definition cast doubt on that restriction.  (D.I. 58, Copy Protection Opening Brief, at 6-7).  Those

sentences, however, further illustrate why the applicants' "single entity" argument *is* a claim-limiting definition. The first emphasizes that because it is a unitary program, the program portion may be downloaded as a whole, unlike a fragmented collection of separate programs. The second statement further emphasizes that the unitary nature of the program allows an unbroken chain of control that was, according to the applicants, an improvement over the prior art cited by the examiner.

Copy Protection suggests that the words "may" and "allow" in the quoted sentences somehow indicate that other definitions were possible. That is a tortured reading that contradicts how one skilled in the art would read those sentences. Neither sentence purports to offer a definition. Instead, they augment the "single entity" definition by emphasizing its advantages over the prior art. Copy Protection suggests a similarly tortured application of the word "might" in the sentence "[t]he 'same' program portion forms a set of instructions forming a single entity, *defined independently of the processing environment in which the instructions might eventually be executed.*" But, that language supports Netflix, not Copy Protection, as it emphasizes the "program portion" is a stand-alone, independent program that a user might choose to execute in a variety of environments. Such platform-independence would obviously not be possible if the program portion was only a partial program and, hence, dependent on another program.

In order to get their patent application granted over the prior art, the applicants told the USPTO that: "[t]he 'same' program portion forms a set of instructions forming a single entity…." That definition is clear and unambiguous, and applicants' use of less certain verbs in other statements only highlights the definiteness with which they defined "program portion." That definition should therefore be applied in this litigation. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citing *Vitronics*, 90 F.3d at 1582) (a

patentee can choose to be his own lexicographer if he defines a term "with reasonable clarity, deliberateness, and precision" and "[s]uch a definition may appear in the ... prosecution history").

### 2. The definitions of program and program portion are identical because Applicants used those terms synonymously and interchangeably.

The applicants used the terms program and program portion synonymously during prosecution as "a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed" and, therefore, Netflix offers the same construction for both. Copy Protection's contrary argument is not based on anything in the specification or prosecution history but, instead, relies exclusively on the doctrine of claim differentiation, *i.e.* that using "different words or phrases" in separate claims creates a presumption that the claims have different meanings and scope." (D.I. 58 at 5, citing *Karlin Tech, Inc. v Surgical Dynamics, Inc.,* 177 F. 3d 968, 871-972). But, like all presumptions, this one may be overcome, and it "can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1480 (Fed. Cir. 1998).

Here, as explained above, the intrinsic evidence and applicants' own arguments overcome that presumption. Copy Protection does not point to any intrinsic evidence that supports giving "program" and "program portion" different scopes. To the contrary, Copy Protection used those terms synonymously and interchangeably during prosecution. For example, Copy Protection acknowledges that the prosecution defines a Java applet as one embodiment of a "program portion":

- "[I]n the present invention, it is **the program portion (e.g., a Java applet)** that is being used to restrict access to functions that would otherwise be legitimately available at the client...." (D.I. 58 at 4 (citing D.I. 53, Ex. C-3 at COPYP0000270 (emphasis added)).

But, the applicants also referred to a Java applet as an embodiment of a "program":

- "When a user operating client computer 3 requests access to data, such as a particular webpage, instead of server 1 just sending the requested data to client computer 3, **another program (an applet)** is triggered to run at client computer 3...." (D.I. 53, Ex. C-1 at COPYP0000072 (emphasis added); *see also* D.I. 53, Ex. C-2 at COPYP0000160).

The applicants' arguments to the USPTO highlight the same point. For example, their Appeal Brief states that the "program" claims (pending claims 30, 33, 34, and 36) and the "program portion" claims (pending claims 1, 28, 29, 31, 32, and 35) "require similar limitations," and that both sets of claims require that "the access to copy or save functions in its unprotected form is controlled by execution of a program portion." (D.I. 53, Ex. C-1 at COPYP0000076 (emphasis in original)). The PTO relied on those representations in overturning the examiner's rejections, stating:

> **In some manner, each of these independent claims requires** that a request from a client and/or source of an access request be sent either to a server or some other receiving element, which in turn sends cryptographically protected or otherwise protected copies of information to the respective clients or source of the access request, **all protected under the control of a broadly recited 'program portion.'**

(D.I. 53, Ex. C-1 at COPYP0000076 (emphasis added)).[1] If applicants disagreed with the USPTO's characterization of all independent claims requiring a "program portion," they could have corrected the record but did not attempt to do so. If these two terms apply in the same way to the same embodiment, and the applicants grouped claims reciting "program" and "program portion" together when prosecuting the patent, those terms must have the same scope.

Even Copy Protection seems to have trouble keeping track of its contrived distinction between "program" and "program portion." In its Opening Brief, Copy Protection equates the "program portion" with the "program object" recited in the specification (D.I. 58 at 6-7), and

---

[1] Copy Protection cites this same passage in support of its construction for the "selectively control access" limitations, conceding that it is not mere dicta. (*See* D.I. 58 at 4).

then correctly points out that the specification recites that the program object can be a Java applet. (*Id.*). In the very next sentence, Copy Protection refers to Java applets as a "smaller program" that runs within a larger program. (*Id.* at 5). But that interpretation is consistent with Netflix's constructions: a "smaller program" is still a "program," not "part of a program." Confusingly, while Copy Protection asserts that Java applets are part of a larger program, it does not explain what that larger program might be. (*Id.* at 7-8). Thus, Copy Protection's constructions not only conflict with the intrinsic evidence, they would serve only to confuse a jury, and would likely render the claims of the patent invalid under 35 U.S.C. § 112.[2]

Thus, the claim language and intrinsic evidence make clear that "program" and "program portion" have the same meaning in the context of the asserted claims, and that meaning is the express definition applicants presented to the PTO: "a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed." Netflix's constructions for these terms should therefore be adopted.

**B.**   **"Selectively controlling access to" (claim 1) / "suppress" (claim 9) / "restrict[ing] or prevent[ing]" (claims 10, 11, 19, and 25) "copy or save functions at the client in respect of the data in its unprotected form."**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form (claim 1) | disabling functionality to copy or save the unprotected data that would otherwise be available at the client | disabling or enabling the user's ability to copy or save decrypted data |
| suppress client computer | suppress functionality to copy or | suppress the user's ability to copy |

---

[2] The term "program portion" does not appear in the '649 patent's specification or in the claims as originally presented to the PTO; it was added by amendment during prosecution. (D.I. 53, Ex. C-3 at COPYP0000259-267). Thus, construing "program portion" to have a meaning different from "program" would render the term indefinite, lacking written description, and lacking enablement, thereby violating a basic canon of claim construction jurisprudence. *MBO Laboratories, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1332 (Fed. Cir. 2007) (holding that "claim construction should not, of course, be blind to validity issues: 'claims should be so construed, if possible, as to sustain their validity'").

| copy or save functions with respect to the unprotected copy of the requested data (claim 9) | save the unprotected data that would otherwise be available at the client | or save decrypted data |
|---|---|---|
| restricting or preventing access to copy or save functions at the client in respect of the data in its unprotected form (claims 10, 25) | restricting or preventing functionality to copy or save the unprotected data that would otherwise be available at the client | restrict or prevent the user's ability to copy or save decrypted data |
| restrict or prevent client computer copy or save functions with respect to the unprotected copy of the requested data (claims 11, 19) | restrict or prevent functionality to copy or save the unprotected data that would otherwise be available at the client | restrict or prevent the user's ability to copy or save decrypted data |

Copy Protection's Opening Brief does not provide any support (or even argument) for construing "selectively controlling" to include "*enabling* copy or save functions," waiving its argument and conceding that it includes only "disabling" functions.  Copy Protection also fails to address why Copy Protection's proposed constructions replace "unprotected data" with "decrypted data," thereby waiving that argument as well.[3]  And the remainder of Copy Protection's proposed constructions run counter to the plain language of the claims.

> **1.**  **Construing "selectively controlling access" to include *enabling* copy and save functions runs counter to the purpose of the alleged invention and all the intrinsic evidence.**

The Parties agree that the term <u>selectively controlling</u> in claim 1 should be construed to include *disabling* copy or save functions, but disagree over whether Copy Protection should be allowed to add *enabling* to the definition.  Copy Protection's Opening Brief fails to include any support or argument for doing so.  In fact, apart from the claim chart at the beginning of the relevant section of its brief, Copy Protection does not mention the word "enabling" at all.

---

[3] Any arguments of first impression Copy Protection makes in its responsive brief as to "enabling" or "decrypted data" should be discounted because Netflix will have been deprived of the opportunity to respond to those arguments, which violates the spirit of the mutual exchange of opening claim construction briefs.

Thus, Copy Protection has effectively conceded that "selectively controlling" does not include "enabling" and the term should be construed as "disabling functionality to copy or save the unprotected data that would otherwise be available at the client."

> **2.     The body of these limitations should be construed as disabling "functionality to copy or save the unprotected data that would otherwise be available at the client."**

As noted above, each of these terms recite some variation of disabling "copy or save functions at the client in respect of the data in its unprotected form." The parties' proposals for the body are:

- **Copy Protection**: "the user's ability to copy or save decrypted data;"
- **Netflix**: "functionality to copy or save the unprotected data *that would otherwise be available at the client*."

Netflix's proposal simply clarifies that for copy or save functions to be disabled at the client, they first must be available there. Put another way, if a device does *not* provide a user with copy or save functions, there would be no copy or save functions to disable.

Applicants emphasized this truism during prosecution: "[I]n the present invention, it is the program portion (e.g., a Java applet) that is being used to restrict access to *functions that would otherwise be legitimately available at the client*...." (D.I. 53, Ex. C-3 at COPYP0000270 (emphasis added)). Similarly, the only embodiment described in the specification is directed to disabling user-controlled copy and save functions that are otherwise available at the client. (D.I. 53, Ex. B at 4:53-58 ("If the user clicks the computer's mouse in the area of the displayed image 8, using the right mouse button, a drop-down menu 9 is displayed which gives the user options including "save", to save the digital data corresponding to the gif file to the computer's hard disc or to some other storage location....")).

The specification further provides that the alleged invention of the '649 patent is to use a

Java applet to disable that pre-existing mouse functionality:

> Because the Java enabled browser is running an applet for the image data in region 12, **the functions of the right mouse button are disabled** for region 12. Therefore, if the user clicks the mouse with the right button, **no menu option is automatically provided for saving, copying or printing the displayed data** in region 12. The right mouse button function is disabled according to usual Java operation for applets as previously described.

(*Id.* at 9:2-9 (emphasis added)).

Because the claim language, specification, and prosecution history all support the truism that in order to disable a feature, that feature must already be present, *i.e.*, otherwise available, on the client, Netflix's construction should be adopted. This is not, contrary to Copy Protection's assertions, an attempt by Netflix to create a non-infringement argument. (*See* D.I. 58 at 11). Rather, Copy Protection's construction attempts to expand its "copy and save" protecting patent to cover devices that do not even have copy and save functions.

> **3.      There is no basis to construe "unprotected data" as "decrypted data."**

Netflix's proposal seeks to maintain claim consistency and keep the term <u>unprotected data</u> as data in its unprotected form. Copy Protection's construction seeks to change the claim term <u>unprotected data</u> to "decrypted data," which would improperly broaden the claims such that "unprotected" data could potentially remain protected by other methods even if it is decrypted, such as hashing or watermarking, which the patent claims as forms of copy protection. But Copy Protection's Opening Brief again failed to address the dispute.

Because Copy Protection has waived its right to pursue this construction, and because there is no basis to construe "unprotected data" as "decrypted data" (*see* D.I. 57 at 10-11), Copy Protection's proposal should be denied.

> **C.      "Determining a machine identifier of the client by analysing its hardware and/or its software configuration" (claim 18)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed |
|------|---------------------------------|----------------------------|

|  |  | Construction |
|---|---|---|
| determining a machine identifier of the client by analysing its hardware and/or its software configuration | scanning the arrangement of the hardware and/or software of the client to determine a machine identifier | ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier |

_Determining_ is a vague, functional descriptor that requires interpretative guidance. Copy Protection's construction would have the Court fall back on broad, extrinsic dictionary definitions that result in virtually boundless claims. Netflix, on the other hand, relies on the intrinsic specification evidence, which expressly describes the method of determining a machine identifier – using a program to scan the client computer:

> "At step R3, the **dogtag program is run in order to provide a machine identification code (MID)** which provides a substantially unique identification of the client. The dogtag program **scans the client computer** both in terms of its hardware and software." (D.I. 53, Ex. B at 10:12-14 (emphasis added)).

Copy Protection's vague "ascertaining characteristics" construction does not assist the jury in understanding the claims and would inappropriately expand coverage to unknown and unsupported methods of determining a machine identifier. Such a construction would render the claim (1) invalid under 35 U.S.C. § 112(a) as lacking enablement, and (2) so indefinite as to violate 35 U.S.C. § 112(b), which is to be avoided where possible. _MBO Laboratories,_ 474 F.3d at 1332 (holding that "claim construction should not, of course, be blind to validity issues: 'claims should be so construed, if possible, as to sustain their validity.'" (quoting _Rhine_, 183 F.3d at 1345)). Netflix's clarification of the term should control.

   **D.** **"A server" (claims 1, 9, 10, 11, 19, 23, 25) and "a server computer" (claims 9, 11, 19, 23)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| a server | one or more computers, each capable of performing all recited server-side steps | one or more processing devices that are capable of providing information by receiving and responding to requests |

| a server computer | one or more computers, each capable of performing all recited server-side steps | one or more computers that are capable of providing information by receiving and responding to requests |
|---|---|---|

The '649 patent's specification teaches only a single network of servers each configured to perform the required steps. Copy Protection's proposal allowing the required claim steps to be performed on any number of servers construes "server" without reference to the specification at all.

Copy Protection argues that the specification teaches a distributed network because the Abstract and "Background of the Invention" sections refer to the World Wide Web, "which is made up of many servers capable of providing information by receiving and responding to requests." (D.I. 58 at 18). However, such disclosures alone are insufficient to support construing "server" as a distributed network. For example, in *FotoMedia Technologies, LLC v. AOL, LLC*, No. 2:07-CV-255, 2009 WL 2175845 (E.D. Tex. July 21, 2009), the "Background of the Invention" section of the patent referred to the World Wide Web as "a network of computer systems" including "servers—computers capable of supplying information or services to users." (Ex. A, U.S. Patent 6,018,774 at 1:53-63). Nevertheless, the district court construed the term "server" to require that each server be "capable of performing all of the recited steps. . . ." *FotoMedia*, 2009 WL 2175845, at *6. The district court concluded that—generalized descriptions of the World Wide Web in the "Background of the Inventions" section notwithstanding—the specification provided "convincing evidence" that a single server must execute all of the steps of the claimed invention because the written description of the ***invention*** did "not suggest or teach the concept of a distributed system anywhere." *Id.* The district court specifically noted that "[t]o the contrary, Figure 2 in the specification shows a single server 31 as containing all of claimed functionality." *Id.* at *6 and n.1.

The specification of the '649 patent similarly describes a single server as containing all of the claimed functionality.  For example, Figures 3 and 5:



Fig. 3

Fig. 5

(*See also* Figs. 1, 10, and 11; and D.I. 53, Ex. B at 2:32-3:18; 3:20-50; 3:53-4:12; 5:12-6:22; 6:45-7:67; 9:1-11:23).  Here, as in *FotoMedia*, "**in light of the disclosure, the inventors did not claim a system that could distribute the steps of the claims at issue between various server computers.**"  *Id.* at 6 (emphasis added); *see also Zapmedia Servs., Inc. v. Apple, Inc.*, 2010 WL 8599970, at *3 (E.D. Tex. Aug. 19, 2010) *aff'd*, 482 F. App'x 533 (Fed. Cir. 2012); *MasterObjects, Inc. v. Google, Inc.*, 2013 WL 2319087, at *8-10 (N.D. Cal. May 28, 2013) *reconsideration denied*, 2013 WL 4532385 (N.D. Cal. Aug. 26, 2013), *aff'd*, 582 F. App'x 893 (Fed. Cir. 2014) and *aff'd*, 582 F. App'x 893 (Fed. Cir. 2014).

Copy Protection also argues that Netflix's proposed construction is erroneous because it fails to distinguish between "a server" and "a server computer."  (D.I. 58 at 18).  Although these

- 12 -

terms are used interchangeably[4] and should be construed the same, Netflix does not object to a construction of "a server" as "one or more processing devices, each capable of performing all recited server-side steps."

Finally, Copy Protection argues that Netflix's proposed construction is vague because it does not identify which steps are "server-side." (D.I. 58 at 18-19). To the extent the claims do not expressly recite that a step is performed at the server, Netflix has proposed constructions to make this clear for the jury. (*See* Sections E and F, *infra*).

**E.** **"Cryptographically protecting the data" (claims 1, 10, and 25) and "sending the cryptographically protected data to the client" (claims 1, 10, and 25)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| Cryptographically protecting the data | cryptographically protecting the data at the server | protecting the data by encryption and/or by an integrity checking procedure. |
| sending the cryptographically protected data to the client | sending the cryptographically protected data from the server to the client | sending the cryptographically protected data to the client (no need to construe) |

As with "a server," Copy Protection asks this Court to construe these terms without any reference to the specification, which teaches only inventions in which data is cryptographically protected by, and sent to the client from, the server. This is improper. *Edward H. Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005)*Phillips*, 415 F.3d 1303 at 1315-16.

Copy Protection argues that the step "cryptographically protecting the data" does not need to be performed at the server but fails to identify where else this step could be performed. (D.I. 58 at 14-15). Similarly, Copy Protection argues that claim 1 "does not require sending the

---

[4]   For example, the preamble to Claim 19 recites, "A method of protecting data downloaded from a **server computer** to a client computer," but the first step of that method recites "downloading a protected copy of requested data from **a server** to a client." The term "server computer" does not appear in the claim after the preamble. The terms are similarly used interchangeably in Claim 23. Moreover, the term "a server computer" does not appear anywhere in the specification, which exclusively refers to "a server" in describing the claimed inventions.

cryptographically protected data <u>from the server</u> to the client"—but doesn't suggest *any*

alternative location from which it could be sent.  There is no alternative third location taught in

the specification, which discloses only a server-client architecture.  (*See, e.g.*, D.I. 53, Ex. B at

Figs. 3, 5).  Nor is there any alternative suggested in the claims themselves, which recite, for

example, "[a] method of protecting data sent *from a server* to a client." (Claim 1, emphasis

added).  Because there is no disclosure of these steps being performed anywhere but at the

server, they should be construed as taking place at the server.[5]

Copy Protection's constructions are not only contrary to the intrinsic evidence, they are

illogical.  For example, Copy Protection admits that in claim 1 the request for access to data is

sent to the server.  (D.I. 58 at 15).  Copy Protection also admits that the data is sent "from a

server to a client." (*Id.*).  Copy Protection further admits that the data is cryptographically

protected by the time it is sent to the client.  It is therefore illogical to argue, as Copy Protection

does, that the recited step of cryptographically protecting the data could be performed at or sent

from somewhere other than the server or that cryptographically protecting the data could be

performed at the client.  Significantly, Copy Protection apparently argues that there is something

incorrect with Netflix's proposed constructions, but cannot identify *anywhere* else where these

---

[5]  Because the specification only teaches performing these steps at the server, a construction that
these steps could be performed anywhere would likely render the claims invalid for lack of
enablement and/or written description support.  *Cf. Genentech, Inc. v. Novo Nordisk A/S,* 108
F.3d 1361, 1364-67 (Fed. Cir. 1997)  (method claim involving a "cleaving" step invalid for
failing to meet the enablement requirement where "the specification does not describe a specific
material to be cleaved or any reaction conditions under which cleavable fusion expression would
work"); *In re Katz Interactive Call Processing Patent Litigation,* 639 F.3d 1303, 1319-20 (Fed.
Cir. 2011) (affirming district court ruling that method claims were invalid for "claiming the step
of 'visually displaying customer number data' without describing that step in the specification").
Therefore Netflix's proposed constructions should be adopted, since claims should be construed,
if possible, to preserve their validity.  *Phillips,* 415 F.3d at 1327.

steps *could* be performed (let alone point to any support in the specification for alternative locations).

Copy Protection also proposes construing "cryptographically protecting" as "protecting . . . by encryption and/or by an integrity checking protection." Although Netflix does not believe that the term "cryptographically protecting" requires construction because it has a plain and ordinary meaning to one of skill in the art, Netflix does not object to construing "cryptographically protecting" in this way. However, it is worth noting that the very arguments Copy Protection offers for this construction—that the only examples of cryptographic protection taught by the specification are encryption and hashing (*see* D.I. 58 at 14-15)—are the same that Copy Protection argues are improper when offered by Netflix, such as for the term "sending the cryptographically protected data to the client." (*Id.* at 16-17 ("While this is an exemplary embodiment, it is not required by the claim language, which was drafted broader in independent claims 1, 10, and 25, and there was no clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction")).

**F.     "A request for access to data" (claims 1 and 10)**

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|------|-------------------------------|----------------------------------------|
| a request for access to data | a request for permission to receive data from the server | A request to receive data |

Copy Protection seeks a construction of "a request for access to data" that completely reads out "*access*." Under the plain and ordinary meaning of that word, a "request for access to data" semantically requires more than simply "a request to receive data"—it requires that the request seek *permission* to receive the data. (*See, e.g.,* Ex. B ("access. n. 1. The ability or right

to enter or use.")).[6]   When the patentee meant to say "a request to receive data," the claims simply say "a request for data."   (*See, e.g.*, D.I. 53, Ex. B at claim 20 ("A method as in claim 19, wherein the program running at the client generates and uploads **a request for data** from the client to the server. . .") (emphasis added)).

In order to read "access" out of claims 1 and 10, Copy Protection conflates permission with the specific "authentication process claimed in dependent claim 5.   (D.I. 58 at 13). "Authenticating" a client—such as "by reference to a payment scheme" (D.I. 53, Ex. B at 2:32-34)—is one way to ensure that access to data is granted only to clients with permission to receive the data, but it is not the only way.   Another way is by assigning the client a "machine identifier" (dependent claim 15), or by transmitting a "unique determinator" to the client "to permit encrypted data to be downloaded thereto from the server" (dependent claim 18).   The fact that multiple dependent claims recite different ways to determine whether the client has permission to receive data from the server demonstrates that Netflix's construction is consistent with the intrinsic evidence (as well as the plain and ordinary meaning of "access").   *See, e.g.*, *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014) ("Under the principles of claim differentiation, the independent claims are presumed to be broader [than their dependent claims].")

Further, the use of the term "permit" in the context of "access" in other claims does not undermine Netflix's proposed construction, as Copy Protection argues.   (D.I. 58 at 14).   Rather, it reinforces the basic point—which Copy Protection does not address—that the plain and ordinary meaning of requesting "access" to something involves requesting *permission* to receive it.

---

[6]   *Random House Webster's College Dictionary* (2nd Ed. 1999).

Finally, Copy Protection does not appear to dispute that this term should be construed as requiring that the request "generat[ed] and upload[ed] to the server" be for permission to receive the data **from that server** (as opposed to from the client or from somewhere else).

### G.  Order of Steps (Claims 1, 10, 25)

| Term | Netflix's Proposed Construction | Copy Protection's Proposed Construction |
|---|---|---|
| Order of steps | The steps of claim 1 must be performed in order. The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting," step, and the "converting" step must be performed after the "sending" step. | Do not agree that all steps of claim 1 must be performed in the order listed.<br><br>Agree that for claim 1, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step. |
| Order of steps | The steps of claim 10 must be performed in order. The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting" step, and the "converting" step must be performed after the "sending" step. | Do not agree that all steps of claim 10 must be performed in the order listed.<br><br>Agree that for claim 10, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step. |
| Order of steps | The steps of claim 25 must be performed in order. The "protecting" step must be performed after the "running" step, the "sending" step must be performed after the "protecting" step, the "converting" step must be performed after the "sending" step, and the "restricting" step must be performed after the "converting" step | Do not agree that all steps of claim 25 must be performed in the order listed. Agree that for claim 25, the "sending the cryptographically protected data" step must be performed after the "cryptographically protecting the data" step, and the "converting the cryptographically protected data" step must be performed after the "sending the cryptographically protected data" step. |

Although Copy Protection disputes that these steps must be performed in the recited order, the arguments it offers actually reinforce Netflix's proposed construction.

First, Copy Protection argues that claim 1's use of the word "'the' . . . shows which steps must precede others." (D.I. 58 at 19). Specifically, Copy Protection argues that because step (2)

recites "cryptographically protecting the data," and step (3) recites "sending <u>the</u> cryptographically protected data to the client," therefore "step 3 of sending <u>the</u> cryptographically protected data to the client must occur after step (2) of cryptographically protecting the data." (*Id.* at 19-20). But by this same reasoning, **step (2)** must occur after **step (1)**, as step (2) uses the word "the" to refer to data first described on an antecedent basis in step (1):

> 1. A method of protecting data sent from a server to a client, said method comprising:
> (1) running a program portion at the client, the program portion generating and uploading to the server a request for access to **data**;
> (2) cryptographically protecting **the data**;

Second, Copy Protection concedes that most of the steps must be performed in the recited order as a matter of logic. (D.I. 58 at 20).[7] Here, as in *Aerotel, Ltd. v. Telco Group, Inc.*, 2010 WL 1916015 (S.D.N.Y. May 12, 2010), *aff'd in part, vacated in part on other grounds, Aerotel, Ltd. v. Telco Group, Inc.*, 433 Fed. Appx. 903 (Fed. Cir. 2011), "[t]he significant degree to which the claims are logically sequential supports a construction requiring that all of the steps must be performed in order." *Id.* at *8.

Further, Copy Protection does not (and cannot) dispute that the specification expressly and implicitly requires an order of steps. The steps of each of these method claims are disclosed in the written description and Figures as being performed in the recited order. (D.I. 53, Ex. B at 3:22-24; 3:54-545; Figs. 5 and 6). For example, claim 1:

> **(1) running a program portion at the client, the program portion generating and uploading to the**

---

[7] Nevertheless, Copy Protection tries to understate the number of terms that must be performed in order by splitting step (4) into two steps, a step (4) and a step (5). This five-step partition is nonsensical. Copy Protection's proposed step (4) ("after the running of the program portion has begun and under control of the program portion at the client") is not a step; it is a phrase that modifies the actual step ("converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form"). In fact, there are four steps in Claim 1, and the only one that Copy Protection does not concede must be performed in the recited order is step (1), which it argues could be performed either before or after step (2).



| server a request for access to data | |
|---|---|
| "The applet A1 is run at step **S7** on the client computer 3 and at step **S8**, the applet causes a BTC file request to be uploaded to the server 1." (7:1-3). | request for applet / download applet bytecodes / run applet / BTC file request / authentication / prepare BTC file for downloading  Fig. 5 |
| **(2) cryptographically protecting the data** | |
| "At step **S10.4** the data is encrypted at the server 1, using a copy of the algorithm EA and the key $K_E$, which were downloaded previously to the client, in the Java bytecodes of applet A1 … Then the resulting file, at step S10.5, is wrapped in a proprietary BTC file format." (7:53-56; 65-67). | hash with algorithm HE & key KH / encrypt with algorithm EA & key KE / wrap file  Fig. 6 |
| **(3): sending the cryptographically protected data to the client** | |
| "At step **S11** (Fig. 5) the BTC file is downloaded to the client 3." (8:26-27). | run applet / BTC file request / authentication / prepare BTC file for downloading / download BTC file / process BTC file |

**(4) after the running of the program portion has begun and under control of the program portion at the client, converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form**

"In step **S12.5** the embedded file EF is decrypted using the encryption algorithm EA and the key $K_E$ previously downloaded in the applet A1. … the applet A1 can display the content of the decrypted file in the region 12 FIG. 4) in the window of the browser 4 in step **S12.8**. … Because the Java enabled browser is running an applet for the image data in region 12, the functions of the right mouse button are disabled for region 12."



When the specification only discloses performing method steps in the recited order, the claims should be construed to require that order. *See, e.g., Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865, 870 (Fed. Cir. 2008).

## III. CONCLUSION

Because Netflix's proposed constructions are drawn exclusively from the language of the claims and the intrinsic evidence, the Court should adopt Netflix's proposed constructions.

Respectfully submitted,

OF COUNSEL:                          POTTER ANDERSON & CORROON LLP

Clay C. James
C. Matthew Rozier                    By:   */s/ Stephanie E. O'Byrne*
Aaron S. Oakley                            Richard L. Horwitz (#2246)
HOGAN LOVELLS US LLP                       David E. Moore (#3983)
One Tabor Center, Suite 1500               Bindu A. Palapura (#5370)
1200 Seventeenth Street                    Stephanie E. O'Byrne (#4446)
Denver, CO 80202                           Hercules Plaza, 6th Floor
Tel:  (303) 899 7300                       1313 N. Market Street
                                           Wilmington, DE  19801
Melissa J. Baily                           Tel:  (302) 984-6000
James D. Judah                             rhorwitz@potteranderson.com
Adam Botzenhart                            dmoore@potteranderson.com
QUINN EMANUEL URQUHART                     bpalapura@potteranderson.com
   & SULLIVAN, LLP                         sobyrne@potteranderson.com
50 California Street, 22nd Floor
San Francisco, CA  94111             *Attorneys for Defendant Netflix, Inc.*
Tel:  (415) 875-6600

Dated:  June 19, 2015
1193311/ 41572