## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COPY PROTECTION LLC, | : | |
| | : | |
| Plaintiff, | : | C.A. No. 14-cv-365-LPS |
| v. | : | |
| | : | |
| NETFLIX, INC., | : | **DEMAND FOR JURY TRIAL** |
| | : | |
| Defendant. | : | |
| | x | |

## COPY PROTECTION'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

Date: June 19, 2015

Jonathan A. David (admitted *pro hac vice*)
Stephen F. Roth (admitted *pro hac vice*)
Aaron S. Eckenthal (admitted *pro hac vice*)
Maegan A. Fuller (admitted *pro hac vice*)
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
Tel:    (908) 654-5000
Fax:   (908) 654-7866
E-mail:JDavid@ldlkm.com
        SRoth@ldlkm.com
        AEckenthal@ldlkm.com
        MFuller@ldlkm.com
        Litigation@ldlkm.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
Tel:    (302) 777-0300
Fax:   (302) 777-0301
E-mail:bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

*Counsel for Plaintiff Copy Protection LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................i

I.  INTRODUCTION ...................................................................................................1

II.  CLAIM CONSTRUCTION PRINCIPLES ..........................................................1

III.  CLAIM CONSTRUCTIONS FOR THE DISPUTED TERMS .........................2

    A.  "program"/"program portion"...................................................................2

        1.  "Program" And "Program Portion" Claims Were
            Separately  Presented And Never Argued To Have
            The Same Meaning ......................................................................2

        2.  "Program Portion" Being "Part Of A Program" Is
            Consistent With  The Specification And Prosecution
            History.........................................................................................5

        3.  Any Special Definition For "Program Portion"
            Could Only Apply To The "Program Portion"
            Claims .........................................................................................7

    B.  "selectively control access to"/"suppress"/"restrict or
       prevent access to" . . . "copy or save functions"....................................7

        1.  Decrypted Or Unprotected Data ................................................7

        2.  Disabling Or Enabling Is Supported By The
            Specification ...............................................................................8

        3.  The Extra Verbiage Of Netflix Of "That Would Be
            Otherwise Available At The Client" Should Not Be
            Included.......................................................................................9

    C.  "determining a machine identifier of the client . . . "............................10

    D.  "a request for access to data"..................................................................10

        1.  A Request For "Permission" Is Not Required ..........................10

        2.  Data From "The" Server ..........................................................12

    E.  "cryptographically protecting the data"/"sending the
       cryptographically protected data to the client" ....................................12

        1.  The Claim Language Supports Copy Protection's
            Construction...............................................................................12

        2.  The Specification Supports Copy Protection's
            Construction...............................................................................13

i

F.      "a server computer"/"a server" .................................................................................14

G.      Order Of Steps (Claims 1, 10, 25) ........................................................................17

IV.     CONCLUSION...........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
  687 F.3d 1292 (Fed Cir. 2012)......................................................................15, 16

*Aerotel, Ltd. v. Telco Grp., Inc.*,
  No. 04-cv-10292, 2010 WL 1916015  (S.D.N.Y. May 12, 2010) ....................18, 19

*DSW, Inc. v. Shoe Pavilion, Inc.*,
  537 F.3d 1342 (Fed. Cir. 2008).............................................................................10

*FotoMedia Techs., LLC v. AOL, LLC*,
  Nos. 2:07-cv-255, 2:07-cv-256, 2009 WL 2175845 (E.D. Tex. July 21, 2009)......16

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008)...........................................................................1, 2

*In re Goodman*,
  11 F.3d 1046 (Fed. Cir. 1993)................................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
  381 F.3d 1111 (Fed. Cir. 2004)............................................................................10

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001)............................................................................18

*MasterObjects, Inc. v. Google, Inc.*,
  No. Civ. 11-1054, 2013 WL 2319087 (N.D. Cal. May 28, 2013)...........................17

*Michael S. Sutton Ltd. v. Nokia Corp.*,
  647 F. Supp. 2d 737 (E.D. Tex. 2009), *aff'd*, 2010 WL 5230901 (Fed. Cir. 2010) ..........19, 20

*Respironics. Inc. v. Invacare*,
  303 Fed. App'x 865 (Fed. Cir. 2008).....................................................................20

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)..............................................................................2

*Zapmedia Servs., Inc. v. Apple, Inc.*,
  No. 2:08-cv-104, 2010 WL 8599970 (E.D. Tex. Aug. 19, 2010), *aff'd*, 482 Fed.
  App'x 533 (Fed. Cir. 2012) ...................................................................................17

STATUTES, RULES & OTHER AUTHORITIES

35 U.S.C. § 101.......................................................................................................7

35 U.S.C. § 112......................................................................................................10

## I.      <u>INTRODUCTION</u>

Netflix claims to "derive" its constructions directly from the intrinsic evidence (Netflix Opening Claim Constr. Br. 1 (D.I. 57) ("Netflix Br.")), but in reality attempts to encumber straightforward terms such as "program," "portion," "analyzing," "server," and "request" with preferred embodiments and nonlimiting examples and comments to create unduly narrow and illogical claim constructions.  Netflix's approach is transparent: add in as many limitations as possible to see what might stick.  But Netflix has not demonstrated for any of the claim terms that the patentee provided special definitions or made statements of clear and unmistakable disavowal to support Netflix's unjustifiably narrow claim constructions.

Netflix contends that Copy Protection's constructions would "confuse and mislead the jury." (*Id.*)  But nearly all of Netflix's constructions do precisely that.  For example, Netflix's construction for both "program" and "program portion" is "a set of instructions *forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed.*"  Unless the jurors have advanced computer science degrees or think that a "portion" is the same as a whole, Netflix's construction will surely baffle and misinform them.  By contrast, Copy Protection's constructions are straightforward and do not "ignore" or "contradict" the intrinsic evidence as Netflix alleges.  (*Id.*)  Copy Protection's constructions are based on ordinary and customary meaning and are fully consistent with the '649 Patent specification and prosecution history as shown in its opening brief and herein.

## II.      <u>CLAIM CONSTRUCTION PRINCIPLES</u>

Netflix's section on legal standards for claim construction omits two important principles critical for a party like Netflix to obtain encumbered, nonordinary meaning claim constructions.  First, to act as a lexicographer and not have a claim term take on its ordinary and customary meaning, a patentee must clearly express the intent to do so.  *See Helmsderfer v. Bobrick*

*Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008).  Netflix has not pointed to any special definitions or instances where the patentee expressed a clear intent to be its own lexicographer.

Second, disavowal of claim scope requires a clear and unmistakable disclaimer and not just the fact that the patent discloses a preferred embodiment.  *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. . . . To constitute disclaimer, there must be a clear and unmistakable disclaimer.").  This concept is also fatal to Netflix's constructions, since Netflix has not, nor cannot, point to any such instances of unmistakable disclaimer made by the patentee.

## III.    CLAIM CONSTRUCTIONS FOR THE DISPUTED TERMS

### A.    "program"/"program portion"

#### 1.    "Program" And "Program Portion" Claims Were Separately Presented And Never Argued To Have The Same Meaning

Netflix is wrong that the term "program" (in independent claims 9, 11, 19, and 23) and the term "program portion" (in independent claims 1, 10, and 25) are "used interchangeably." (Netflix Br. 2.)  This is not only evident from the claims themselves, where the two different terms were in fact used, but from the original claims and subsequent prosecution history, which Netflix completely ignores.

Original independent claim 1 did not use "program," "program portion," or "program object," while the term "program object" was used in dependent claims 7, 8, 10, and 14 as shown below:

> 1.   A method of copy protecting data sent from a server to a client for presentation to a user, comprising: cryptographically protecting the data; sending the cryptographically protected data to the client; and selectively controlling copying functions of the client in respect of the data whilst the data is being held by the client in a form suitable for presentation to the user.

2

7.   A method according to any preceding claim including: downloading a <u>program object</u> to the client . . . .

8.   A method according to claim 7 . . . wherein the message includes information concerning the <u>program object</u>, and uploading a request for the <u>program object</u> in response to said information in the message.

10.   A method according to claim 8 or 9 wherein the <u>program object</u> comprises a Java, Active X or OLE applet.

14.   A method according to anyone of claims 7 to 10 wherein the <u>program object</u> includes data concerning a cryptographic key . . . .

(Am. Joint Claim Constr. Chart Exh. C, at COPYP0000406-410) (D.I. 53) ("JCCC").

In an Amendment filed on June 20, 2000, the term "program portion" was first presented. Namely, the patentee amended independent claim 1 to add "running a <u>program portion</u> at the client" and also changed the language in the dependent claims from "program object" to "<u>program portion</u>" (*Id.* at COPYP0000261).   The patentee further added new independent claims 28-30, with new claim 28 using the term "<u>program portion</u>" but new claims 29-30 using the term "<u>program</u>":

28.   A server . . . comprising . . . generating means for generating a <u>program portion</u> for sending to the source of the access request . . . .

29.   A computer program carrier medium containing a computer <u>program</u> which implements the functions of the server in claim 28 when installed and run on a server.

30.   A method of protecting data . . . comprising: . . . running a <u>program</u> at the client to both: (a) unprotect the downloaded data . . . and (b) suppress client computer copy and save functions with respect to the unprotected copy of the requested data.

(*Id.* at COPYP0000266-267 (emphasis added).)   In the end of remarks section of the Amendment, as to new claims 28-30, the patentee explained:

Attention is also drawn to new claims 28-30. . . .   Claim 29 is directed to a computer program carrier medium containing a computer <u>program</u> which implements the functions of the server in claim 28 when installed and run on a server. Claim 30 is an independent method claim . . . where a <u>program</u> is run at the client to both unprotect downloaded data and suppress client computer copy and save functions . . . .

(*Id.* at COPYP0000272 (emphasis added).)   The patentee made no remarks that the terms "program" and "program portion" were the same thing.

3

Next, in an Amendment filed on November 21, 2001, the patentee added new "program portion" claims 31 and 32 (issued as claims 25 and 26), and a new "program" claim 33 (issued as claim 19).   (*Id* at COPYP0000201-202.)   The patentee explained that the new claims were "added to provide additional protection for the invention" and that new claim 33 required "running a <u>program</u> at the client to . . . restrict or prevent client computer copy and save functions with respect to the unprotected copy of the requested data."   (*Id* at COPYP0000207-208 (emphasis added).)   Again, the patentee made no statement that "program" and "program portion" meant the same thing.

In an Amendment filed on May 2, 2003, the patentee added new "program portion" claim 35 (issued as claim 10) and new "program" claims 34 and 36 (issued as claims 9 and 11). (*Id.* at COPYP0000124-126.)  The patentee yet again explained that the new claims "have been added to provide additional protection for the invention." (*Id.* at COPYP0000132.)  No remarks were made equating the terms "program" and "program portion."

Finally, on appeal, the patentee specifically distinguished between "program" and "program portion" when it presented three distinct groups of claims, summarized as follows:

| Group | Claims On Appeal[1] | Issued In Patent As | Term Used |
|---|---|---|---|
| I | 1, 29, 31, 35 | 1, 10, 22, 25 | "program portion" |
| II | 30, 33, 34, 36 | 9, 11, 19, 23 | "program" |
| III | 28, 32 | 13, 26 | "program portion" |

(*See id.* at COPYP0000046.)   The patentee then carefully delineated — *by page and line number* — which arguments it made in the Appeal Brief applied to which group of claims, a fact ignored by Netflix:

The arguments presented in page 6, line 17 to page 10, line 5 of the Appeal Brief thus <u>apply to the Group II claims</u>. . . .   The arguments presented in page 10, line 6 to page 11,

---

[1] The claims as originally numbered are listed in the Appendix of the Appeal Brief, at 13-21, JCCC Exh. C, at COPYP0000080-88.

line 15 of the Appeal Brief <u>apply to the Group I claims</u> in addition to the arguments presented in page 6, line 17 to page 10, line 5 of the Appeal Brief.  <u>The Group III claims require the limitations of the Group I claims</u> and further require the (same) program portion being generated by a server and then downloaded to a client (claims 7, 8 and 14) or a source of the access request (claims 28 and 32).

(*Id.* at COPYP0000046-47 (emphasis added).)

Thus, the patentee treated the Group II "program" claims differently than the Groups I and III "program portion" claims.  And again, in the appeal, the patentee made no statements that the "program" and "program portion" meant the same thing and treated the two terms differently.

### 2.   "Program Portion" Being "Part Of A Program" Is <u>Consistent With  The Specification And Prosecution History</u>

Netflix argues that Copy Protection's ordinary meaning construction of "program portion" as "part of a program" is inconsistent with the specification and prosecution history. (Netflix Br. 4.)  This argument fails on multiple levels.  First, there is no inconsistency with the intrinsic evidence since the patentee did not specially define "program portion" in the specification or file history.  Second, the sentence that Netflix partially quotes from the Appeal Brief about "program portion" was explanatory.  Namely, it did not include the "requires" language specifically used in the first three sentences, nor did it rise to a level of clear and unmistakable disavowal.  Third, the patentee's examples of a "program object" in the specification and prosecution history are consistent with Copy Protection's construction, since the specification explains that the "program object may comprise a Java applet" and "envisages the use of other program objects such as Active X or OLE." ('649 Patent 2:17-21.)  The patentee also gave an example of a "program portion" being a Java applet in the prosecution history. (JCCC Exh. C, at COPYP00000270.)  Finally, the full sentence from the prosecution history that Netflix fails to include in its construction ("although when they are executed, it would be in the context of the instructions being <u>part of</u> a single entity") supports Copy Protection's construction,

since the program portion instructions could be executed in the context of a larger single entity, such as a Java applet or Active X object instructions being executed in a web browser.  (*See id.* at COPYP0000077.)

It is evident that the patentee distinguished between "program" and "program portion" claims during prosecution.  Indeed, the two bulleted statements cited by Netflix (Netflix Br. 4) support Copy Protection's claim construction.  The first quote by Netflix ("program portion (e.g., a Java applet) . . . ") shows that an example of a "program portion" is a Java applet.  The second quote ("another program (an applet) . . . ") is taken from the Appeal Brief with <u>both</u> "program" and "program portion" claims pending, and explains the client computer could run a program or an applet to provide the controlled environment at the client computer:

> When a user operating client computer 3 requests access to data, such as a particular webpage, instead of server 1 just sending the requested data to client computer 3, <u>another program (an applet) is triggered to run at client computer 3 and take over the process for obtaining the requested data from server 1</u> and providing a controlled environment at client computer 3 in which the decrypted data may be viewed by the user.

(*Id.* at COPYP0000160 (emphasis added).)  As specified in the claims, it is either the "program portion" or "program" that is triggered to run at the client computer to provide the controlled environment in which the decrypted data may be viewed by the user.  (*See, e.g.,* claim 1 ("running a program portion at the client, . . . converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions at the client") and claim 11 ("running a program at the client after access to the program is permitted to both: (a) unprotect the downloaded data . . . and (b) restrict or prevent client computer copy or save functions").)

Finally, the Patent Office no doubt understood that "program" and "program portion" were different terms, else it would have issued double patenting rejections for presenting identical claims.  *See In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("If the claimed

inventions are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an inventor is entitled to a single patent for an invention.").

### 3. Any Special Definition For "Program Portion" Could Only Apply To The "Program Portion" Claims

Finally, the partially quoted statement in the Appeal Brief that Netflix is relying on only applied to Groups I and III claims reciting a "program portion," not to Group II claims that recited "program." Thus, even if Netflix were correct that the patentee "expressly defined 'program portion' during prosecution" (Netflix Br. 3), which it did not, this could only apply to the term "program portion" and not to "program."

### B. "selectively control access to"/"suppress"/"restrict or prevent access to" . . . "copy or save functions"

#### 1. Decrypted Or Unprotected Data

As an initial matter, the parties' dispute over "unprotected data" (Netflix Br. 10) can be readily resolved.[2] While the data protection in the patent is preferably done using encryption, to simplify matters, Copy Protection can agree with Netflix to construe "the data in its unprotected form" (in claims 1, 10, and 25) as "the unprotected data." Likewise, Copy Protection can agree to construe "the unprotected copy of the <u>requested</u> data" (claims 9, 11, and 19) similarly as "the unprotected <u>requested</u> data." Therefore, Copy Protection's revised constructions would now be as follows:

---

[2] The actual phases at issue are "the data in its unprotected form" (claims 1, 10, and 25) and "the unprotected copy of the requested data" (claims 9, 11, 19, and 23).

| selectively control[ling] access to copy or save functions at the client in respect of the data in its unprotected form (claim 1) | |
|---|---|
| **Copy Protection's Revised Construction** <br> disabling or enabling the user's ability to copy or save ~~decrypted~~ the unprotected data (claim 1) | **Netflix's Construction** <br> disabling functionality to copy or save the unprotected data that would otherwise be available at the client |
| **suppress client computer copy or save functions with respect to the unprotected copy of the requested data (claims 9, 23)** | |
| **Copy Protection's Revised Construction** <br> suppress the user's ability to copy or save ~~decrypted~~ the unprotected requested data (claim 9, 23) | **Netflix's Construction** <br> suppress functionality to copy or save the unprotected data that would otherwise be available at the client |
| **restrict[ing] or prevent[ing] access to copy or save functions … in respect of the data … in its unprotected form  (claims 10, 25) / restrict or prevent client computer copy or save functions with respect to the unprotected copy of the requested data (claims 11, 19)** | |
| **Copy Protection's Revised Construction** <br> restrict or prevent the user's ability to copy or save ~~decrypted~~ the unprotected data (claims 10, 25) <br><br> restrict or prevent the user's ability to copy or save ~~decrypted~~ the unprotected requested data (claims 11, 19) | **Netflix's Construction** <br> restrict[ing] or prevent[ing] functionality to copy or save the unprotected data that would otherwise be available at the client |

## 2. <u>Disabling Or Enabling Is Supported By The Specification</u>

It is perplexing how Netflix can argue that Copy Protection's construction of <u>disabling or enabling</u> copy or save functions for selectively controlling access to copy or save functions "has no support in the specification and contradicts the entire purpose of the '649 patent." (Netflix Br. 7.)  Netflix must not have fully read the patent.  The specification states: "Also, the menu may offer an option to save the document in an unprotected format upon payment of an additional larger fee than that paid to view the image initially."  ('649 Patent 9:44-46.)  In this example, the user first pays a fee to <u>view</u> the data in an unprotected format (not permitting the user to save, *i.e.,* <u>disabling</u> the save function), and if the user pays an additional larger fee, he can "save the document in an unprotected format" (thus permitting the user to save, *i.e.*, <u>enabling</u> the

8

save function).  This passage and others[3] clearly support "enabling" copy or save functions, such as when a larger fee is paid for the copyrighted work.

### 3. The Extra Verbiage Of Netflix Of "That Would Be Otherwise Available At The Client" Should Not Be Included

Netflix tries to justify its construction of "disabling functionality to copy or save the unprotected data <u>that would otherwise be available at the client</u>" by arguing that this should not be controversial.  (Netflix Br. 9.)  But it is.  First, there is no clarity as to what Netflix means by "that would otherwise be available at the client."  This language will not aid or inform the jury and will only serve to confuse them. Second, there is no clear and unmistakable disavowal in the statement from which Netflix quotes, which is merely explanatory as discussed below.

Third, in its construction, Netflix quotes only from a portion of the statement, and misquotes that portion, which even further muddies the water.  The full statement is: "<u>But</u> in the present invention, it is the program portion (e.g., a Java applet) that is being used to restrict access to functions that would otherwise be <u>legitimately</u> available at the client <u>(e.g., provided via the Java subsystem)</u>." (JCCC Exh. C, at COPYP0000270 (emphasis added).)  Netflix, however, omits the word "legitimately" from its construction where the patentee contrasted the "legitimate" use of a Java applet example in the present invention to "non-legitimate" uses in Dean, which disclosed compromising Java subsystems with rogue applets and loopholes:

> Dean et al disclose only methods by which security features in the Java subsystem might be compromised, in a negative way, by rogue applets. . . . Dean does not teach how to use legitimately provided Java features, only how to exploit a miscellany of loop-holes that were not intended to be available."  (*Id.*)

By contrast, Copy Protection's construction is clear and captures the essence of all three

---

[3] *E.g.*, '649 Patent 9:23-26 ("The purpose of the present scheme however, is to make payment of a small monetary sum in respect of the copyright protected work, more attractive than the effort of breaking the protection regime provided by the invention."); *id.* 2:34-37 ("The authentication process may be performed by reference to a payment scheme, to enable a royalty to be collected in respect of the downloaded, cryptographically protected data.").

related limitations – that <u>the user's ability to copy or save</u> the unprotected data is selectively controlled, suppressed, or restricted or prevented.

### C. "determining a machine identifier of the client . . ."

Netflix argues that its construction is supported by the specification while Copy Protection's is not. (Netflix Br. 11.) This is not true. Netflix's construction simply reads in a preferred embodiment, which is obviously "consistent with the specification," but improperly does so since Netflix has shown no clear disavowal. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) ("And, even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." (citations and internal quotation marks omitted)); *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) ("Moreover, when claim language is broader than the preferred embodiment, it is well-settled that claims are not to be confined to that embodiment.").

Further, the example in the specification supports Copy Protection's claim construction. Certainly, "scanning the arrangement" of the hardware and/or software of the client to determine a machine identifier is one way of "ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier." This example provides an enabling disclosure and does not render the claim term indefinite as argued by Netflix. (Netflix Br. 12.)[4]

### D. "a request for access to data"

#### 1. A Request For "Permission" Is Not Required

Netflix tries to include a request "for permission" limitation in this claim element, which

---

[4] Netflix's § 112 arguments (Netflix Br. 11-12) should be stricken or disregarded as violating the parties' agreement in the JCCC, which stated: "The parties have also agreed not to present validity challenges under 35 U.S.C. § 112 at the claim construction stage, but reserve the right to assert any such challenges at any time in the case otherwise allowed by the Scheduling Order and the Court." (*Id.* at 1.)

is an optional feature in the '649 Patent.  As explained in Copy Protection's opening brief, the patent differentiates between (1) the client requesting access to the data, and (2) the client <u>requesting permission</u> to access the data, with the server authenticating that the client has <u>permission</u> to receive data.  This "permission" concept is not required by the more broadly drafted independent claims.  (*See* Copy Protection Br. 12-14.)

Netflix argues that the language used in dependent claim 20 supports its construction because the word "access" was not used in dependent claim 20.  (Netflix Br. 17.)  However, Netflix is wrong for a number of reasons.  First, claim 20 depends from independent claim 19, which does not have the claim term at issue ("a request for access to data").  Thus, dependent claim 20 does not limit or bear on this phrase.

Next, the independent claims that include this term (claims 1, 10, and 25), by the logic of their own words, do not include a requirement of requesting "permission" to receive the data, since if requesting permission were required, the server could not send the data as provided by these claims, which all call for "sending the cryptographically protected data to the client," unless permission or authentication were granted.

Further, dependent claim 20 merely specifies that it is the "program running at the client" that makes the request for the data from the server, since independent claim 19 more broadly claims "downloading a protected copy of requested data from a server to a client."

Finally, Netflix ignores claims 10, 13, 22, 25, and 26 where the patentee expressly claimed the concept of "permission."  In those claims, "permission" was claimed, but only in relation to access to the program portion and not to the data.  Thus, when the patentee wanted to include limitations about "permission," it did so expressly such that a limitation of "permission" should not be implicitly read into claims 1 and 10 as Netflix wrongly contends.

2.       **Data From "The" Server**

Netflix tries to add in the requirement that the data received is "from <u>the</u> server."  But the independent claims at issue do not specify that it is "<u>the</u> server" that sends the cryptographically protected data to the client.  This can be seen, for example, from the "running" and "sending" steps of claim 1:

> 1. A method of protecting data sent from a server to a client, said method comprising:
> running a program portion at the client, the program portion generating and uploading to <u>the server</u> a request for access to data;
> cryptographically protecting the data;
> <u>sending the cryptographically protected data to the client</u>; and . . . .

Here, the "running" step specifies that the program portion at the client uploads the request for access to data to <u>the</u> server.  However, the subsequent "sending" step does not specify sending of the cryptographically protected data to the client from <u>the</u> server.  Thus, Netflix's efforts to add in "data from the server" should be denied.

E.       **"cryptographically protecting the data"/"sending the cryptographically protected data to the client"**

1.       **The Claim Language Supports Copy Protection's Construction**

Netflix's own argument makes clear that the step of "cryptographically protecting the data" need not occur at <u>the server</u> and that the step of "sending the cryptographically protected data to the client" does not require that that data be sent from <u>the server</u>.  Namely, in its opening brief, Netflix highlights language in claim 1 with **bolding** that shows what must be performed <u>at the client</u> as follows:

> [1. A method of protecting data sent from a server to a client, said method comprising:]
> (a) running a program portion **at the client**, the program portion generating and uploading to the server a request for access to data;
> (b) cryptographically protecting the data;
> (c) sending the cryptographically protected data to the client; and
> (d) after the running of the program portion has begun and under control of the program portion **at the client**, converting the cryptographically protected data to an unprotected form and selectively controlling access to copy or save functions **at the client** in respect of the data in its unprotected form.

12

(Netflix Br. 15 (emphasis in original).)  But with no similar "**at the server**" language found in step (b), or "**from the server**" language found in step (c), it becomes apparent that when a step was to be performed at (or from) the client or the server, it was expressly specified in the claim by the patentee.  Namely, "at the client" was recited in step (a) and twice in step (d), "to the client" was recited in step (c), and "to the server" was recited in step (a).

Netflix tries to use the preamble of claim 1 to support is position, but the preamble supports Copy Protection's position.  Specifically, step (b) of "cryptographically protecting the data" does not involve "the server" set forth in the preamble, nor does step (c).  It is irrelevant to claims 1, 10, and 25 whether "the server" is cryptographically protecting the data, only that there is a step of cryptographically protecting data before it is sent to the client in step (c).  Likewise, it is irrelevant to claims 1, 10, and 25 whether "the server" specified in step (a) is actually sending the cryptographically protected data to the client, only that data is sent "from <u>a server</u> to a client" as set forth in the preamble.  Clearly, in accordance with the '649 Patent's web-based network comprising many servers ('649 Patent 1:6-9, 1:19-21), one server could be used for receiving the request for access to the data and another server could be used for sending the cryptographically protected data to the client.

Finally, as to step (b), Netflix's construction is vague as to whether it requires an <u>act</u> of cryptographically protecting the data to be done at the server (or at any server) or requires the server (or any server) to be cryptographically protecting the data by maintaining the data in a cryptographically protected format.  While either way would work and be covered by step (b), there is no such "server" requirement in step (b) nor is there any clear and unmistakable disavowal that Netflix can point to.

## 2. <u>The Specification Supports Copy Protection's Construction</u>

Netflix also argues that the steps (b) and (c) "must be performed at the server" because

step (b) "is performed at the server in the sole embodiment" and step (c) "is also performed at the server in the sole embodiment . . . as well as in the preamble . . . ."  (Netflix Br. 15.)  Netflix is wrong on both accounts.

As to step (b), the <u>act</u> of protecting the data need not occur "at the server" since the data could already be cryptographically protected or encrypted beforehand and then placed on the server.  In that regard, Netflix fails to realize or mention that the specification discusses using cryptographically protected or encrypted data without requiring where or when the encryption initially occurred:

> More specifically, the method according to the invention may include . . . running the program object on the client such that a request is uploaded to the server for <u>a file containing the cryptographically protected data</u>, downloading the file to the client, . . . . (*Id.* 1:63-67 (emphasis added).)
>
> The invention furthermore includes a method of downloading <u>encrypted data</u> from a server to a client, . . . to permit <u>encrypted data to be downloaded thereto from the server</u> . . . .

(*Id.* 2:55-65 (emphasis added).)

> The data to be displayed in region 12 <u>is cryptographically protected</u> so that it cannot be readily deciphered . . . . In this example, the cryptographic protection includes <u>encryption of the downloaded data</u> . . . .

(*Id.* 6:54-59 (emphasis added).)

Furthermore, the "sole embodiment" cited by Netflix is expressly described by the patent as only an example: "An <u>example</u> of a downloading process in accordance with the invention will now be described in more detail with reference to FIGS. 3, 4 and 5."  (*Id.* 5:60-62 (emphasis added).)  Again, Netflix cannot simply read in limitations from an example, even if it is the sole example.  Here, the claim language and specification mandate otherwise broader coverage and there has been no clear and unmistakable disavowal by the patentee.

### F.     <u>"a server computer"/"a server"</u>

To arrive at its construction, Netflix first concedes that <u>a</u> server or <u>a</u> server computer can include <u>one or more</u> computers.  Then, Netflix tries to undo this concession by asserting that the

"one or more computers" can only perform the claimed steps "by a single network of servers each configured to perform the required steps" and cannot perform steps that are "divided among a distributed network of specialized servers" (Netflix Br. 12), an argument that it makes to match up to language in a case that it found. But there is no discussion, let alone clear disavowal, that "each" such server or computer must be "capable of performing all recited server-side steps."

First, Netflix's construction is illogical. Given that Netflix agrees that "a server" includes multiple computers, why would the patentee redundantly limit the claims to require "each" computer to be able to perform "all" of the claimed steps? Indeed, the patent explains that "the World Wide Web comprises many servers connected over the Internet in a web" ('649 Patent 1:19-21), and shows processes performed by a "web server" divided into separate processes, including "cryptographic processes 13," "watermark processes 14," and "main processes 15." (*Id.* Fig. 3.)

Second, Netflix cannot rely on the words "a server" or "a server computer" (Netflix Br. 12) since there has been no exception to the general rule that "a" means "one or more":

> As a general rule, the words "a" or "an" in a patent claim carry the meaning of "one or more." . . . The exceptions to this rule are extremely limited: a patentee must evince a clear intent to limit "a" or "an" to "one." The subsequent use of definite articles "the" or "said" in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning.

*01 Communique Lab., Inc. v. LogMeIn, Inc*., 687 F.3d 1292, 1297 (Fed Cir. 2012). Indeed, in *01 Communique*, the Federal Circuit found that a locator server computer, which included software that performed four computer steps and was claimed as "a location facility," allowed for the four steps to be performed across multiple server computers since "nothing in the claim language or the specification compel[led] a departure from the general rule" and the "patent's use of words such as 'a,' 'its,' and 'the' in the claims [was] insufficient to limit the meaning of 'locator server computer' to a single physical computer." *Id.*

15

Third, Netflix's argument that the prosecution history requires an "unbroken chain of control" does not relate to the need for "each" computer to be able to redundantly perform "each" of the claimed steps.  Rather, the prosecution history passage cited by Netflix (Netflix Br. 13) simply relates to the "program portion," which is run at the <u>client</u> and not at the server(s). (*See, e.g.,* claim 1: "running a program portion <u>at the client . . . .</u>")

The cases cited by Netflix are inapplicable.  In *FotoMedia Technologies, LLC v. AOL, LLC*, Nos. 2:07-cv-255, 2:07-cv-256, 2009  WL 2175845  (E.D. Tex.  July 21,  2009),  the competing constructions of "a server" were "one or more server computers" versus "one server computer."  *Id.* at *7.  By contrast, Netflix concedes that "a server" in the '649 Patent includes "one or more computers."  Further, in *FotoMedia*, the defendants argued that the patent did not suggest or teach the concept of a distributed system, and would have had to spell out "the integration of various components, conflict resolution between the multiple servers, and other related problems that would arise from utilizing such a system."  *Id.* at *6.  In the '649 Patent, however, the patentee disclosed that the invention had "particular application to protecting data transmitted through a network, such as hypermedia transmitted over a web-based network" ('649 Patent 1:6-9), and that "the World Wide Web comprises many servers connected over the Internet in a web." (*Id.* 1:19-21.)  Further, there would be no like conflicts or problems with the '649 Patent, where the one or more computers are simply used to <u>send</u> the protected data to the client.

In *Zapmedia Servs., Inc. v. Apple, Inc.*, No. 2:08-cv-104, 2010  WL 8599970 (E.D. Tex. Aug. 19, 2010), *aff'd*, 482 Fed. App'x 533 (Fed. Cir. 2012), the court noted that the "server comprising" claim language of claim 4 ("A media asset management system comprising: <u>a</u> <u>server comprising</u>: a  user  account . . . a  server  database  application . . . ;  and  a  server

application . . . ") "[o]n its face . . . requires 'a server,' *i.e.*, one or more servers, that include the recited limitations." *Id.* at *3.  In the '649 Patent, there is no such "a server comprising" claim language requiring the server itself to comprise three separate features, only that the server sends or downloads the protected data.

Finally, *MasterObjects, Inc. v. Google, Inc*., No. Civ. 11-1054, 2013 WL 2319087 (N.D. Cal. May 28, 2013) (Netflix Br. 14 n.5) is likewise not helpful.  There, the court found clear disavowal during prosecution when distinguishing over the Purcell reference, which the patentee described "as dispersing client queries to <u>multiple</u> servers, [so] 'as to maximize the chances that at least one of the servers can provide the desired data, rather than to have those queries contained in a single session between a single client and a <u>single</u> server.'" *Id.* at *9 (emphasis added).  No such statements distinguishing between single and multiple servers were made by the patentee in the '649 Patent's prosecution history.

### G.       Order Of Steps (Claims 1, 10, 25)

Netflix argues that each step in claims 1, 10, and 25 must be performed in the exact order listed.  This is not required based on the claim language, specification, or prosecution history. Also, the cases cited by Netflix do not entitle it to use a "shortcut" that if some steps are logically performed before others, it *ipso facto* follows that all steps must be done in the exact order listed.

The grammar and logic of claims 1, 10, and 25 do provide that certain steps (the steps shown in *italics* below) need to occur after others by referring to prior steps:

1. A method of protecting data sent from a server to a client, said method comprising:

running a program portion at the client, the program portion generating and uploading to the server a request for access to data;

cryptographically protecting the data;

*sending **the cryptographically protected data** to the client; and*

***after the running of the program portion has begun*** *and under control of the program portion at the client, converting **the cryptographically protected data** to an unprotected form and selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form.*

The first two steps, however, do not refer to prior steps.[5]  Further, the specification supports the

fact that no particular order is required for the first two steps, and explains that the data is already

cryptographically protected <u>before</u> running the program object at the client:

More specifically, the method according to the invention may include . . . running the program object on the client such that a request is uploaded to the server for <u>a file containing the cryptographically protected data</u>, downloading the file to the client, . . . .

(*Id.* 1:63-67 (emphasis added).)

In addition, other claims in the '649 Patent support Copy Protection's position.  For

example, claims 11 and 19 do not list running a program first and then protecting the data.

Rather, the steps are listed in the opposite order of "downloading a protected copy of requested

data" and then "running a program at the client . . . ."

The *Aerotel* case, cited by Netflix (Netflix Br. 18), is distinguishable.  There, the claims

at issue (claims 1 and 23) had seven or eight separate steps, each of which was lettered:

1. A unique method for making telephone calls from any available telephone, said method comprising the steps of:
(a) obtaining a special code by depositing a prepayment amount;
(b) storing the prepayment amount in a memory in a special exchange for use in verifying calling party calls;
(c) dialing said special exchange when a telephone call connection is desired;

---

[5] Indeed, in *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001), the Federal Circuit held that step one of a method claim can be performed after step four, even though step four referred to "<u>the</u> catalog code" introduced in step one.  *Id.* at 1328.  Thus, in a method claim, even a step that recites "said" or "the," referring to an earlier object, does not always have to be performed after the step that first introduces the object.

(d) inputting such special code for verification;
(e) inputting the number of the called party;
(f) verifying the special code and comparing the prepayment amount less any deduction for previous calls in the memory and the minimum cost of the inputted call;
(g) connecting called party to the calling party in response to the verification;
(h) monitoring the prepayment amount less deductions for the running cost of the call; and
(i) disconnecting said call when the prepayment amount has been spent.

*Aerotel, Ltd. v. Telco Group, Inc.*, No. 04-cv-10292, 2010 WL 1916015, at *Appendix (S.D.N.Y. May 12, 2010).   By contrast, none of the steps in claims 1, 10, and 25 of the '649 Patent are lettered or state they comprise "the steps of" as in *Aerotel*.  *Id.* at *7 (explaining claim 1 provides for a "method comprising the steps of . . . , and then lists the steps in lettered order" (emphasis in original)).   It was also "the significant degree to which the steps are logically required to follow in their given alphabetical orders" that led the *Aerotel* court to find the steps must be performed sequentially.  *Id.* at *6-7 (finding claim 1 required: Step a before Steps d, f, and i; Step b before Steps f, h, and i; Step c before Steps d and i; Step e before Step g; Step f before Steps g, h, and i; and Step g before Steps h and i).

Likewise, the *Sutton* case cited by Netflix (Netflix Br. 19) differs from the present case. There, the claims required eight or nine ordered logic steps (claim 3 is shown below):

(1) if the received packet has a predetermined header and the receiver is configured to receive unmodified messages, then processing the packet as a modified packet according to steps (2) to (8), otherwise sending the packet to a user's application as an unmodified paging message,
(2) if the receiver is configured to receive only data information messages processing the packet according to steps (3) to (8),
(3) treating the packet as 7 bit characters and reconstituting any characters indicated by a predetermined flag,
(4) packing the 7 bit characters into 8 bit characters,
(5) checking a frame byte for type of packet and compression,
(6) decompressing the packet to data,
(7) validating the subchannel and if valid releasing security passing the data to an end user application, and
(8) if the message is a control message parsing and processing the control message.

*Michael S. Sutton Ltd. v. Nokia Corp.,* 647 F. Supp. 2d 737, 742-43 (E.D. Tex. 2009), *aff'd*, 2010 WL 5230901 (Fed. Cir. 2010).  The court found the steps were clearly written in a logical order,

with "step (1) of claim 3 refers directly to steps (2) to (8), indicating that it must be performed first," that the "logically progressive language alone provides a strong indication that the steps must be performed in the recited order" and that the patent's summary and written description also described the precise order of steps recited in the claims. *Id.*, 647 F. Supp. 2d at 743.

Finally, in the nonprecedential *Respironics* case (Netflix Br. 19), the issue was whether the term "<u>selected</u> higher and lower pressure magnitudes" recited in a first step required the pressure magnitudes to be chosen <u>prior to</u> later listed steps (used to determine whether the patient is inhaling or exhaling). *Respironics. Inc. v. Invacare*, 303 Fed. App'x 865, 869-70 (Fed. Cir. 2008). Based on the specification (which only referred to the pressure magnitudes as being "predetermined" or "preselected"), and the prosecution (where "selected" was added in place of "alternately"), the term was held to require the pressure magnitudes to be chosen "prior to" operation of circuitry used to determine whether the patient is inhaling or exhaling. *Id.* at 872. By contrast, there is no such "selected" or "preselected" type requirement in claims 1, 10, and 25, the '649 specification expressly provides support for either order, and the claims were not amended in any way to require a particular order for these first two steps.

## IV.    <u>CONCLUSION</u>

For the reasons set forth in opening brief this responsive brief, Copy Protection respectfully requests the Court to adopt its proposed claim constructions.

Dated:  June 19, 2015

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
(302) 777-0301(Fax)
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Jonathan A. David (admitted *pro hac vice*)
Stephen F. Roth (admitted *pro hac vice*)
Aaron S. Eckenthal (admitted *pro hac vice*)
Maegan A. Fuller (admitted *pro hac vice*)
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090
(908) 654-5000
(908) 654-7866 (Fax)
JDavid@ldlkm.com
SRoth@ldlkm.com
AEckenthal@ldlkm.com
MFuller@ldlkm.com
Litigation@ldlkm.com

*Counsel for Plaintiff Copy Protection LLC*