IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COPY PROTECTION LLC,<br><br>    Plaintiff,<br><br>v.<br><br>NETFLIX, INC.,<br><br>    Defendant. | Civil Action No. 14-365-LPS |

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE

Jonathan A. David, Stephen F. Roth, Aaron S. Eckenthal, Maegan A. Fuller, LERNER, DAVID, LITTENBERG, KRUMHOLZ & MENTLIK, LLP, Westfield, NJ

    Attorneys for Plaintiff


Richard L. Horwitz, David E. Moore, Bindu A. Palapura, Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Clay C. James, C. Matthew Rozier, Aaron S. Oakley, HOGAN LOVELLS US LLP, Denver, CO

Melissa J. Baily, James D. Judah, Adam Botzenhart, QUINN EMANUEL URQUHART & SULLIVAN, LLP, San Francisco, CA

    Attorneys for Defendant

**MEMORANDUM OPINION**

August 5, 2015
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I. BACKGROUND

Plaintiff Copy Protection LLC ("Plaintiff") filed this patent infringement action against Defendant Netflix, Inc., alleging infringement of U.S. Patent No. 7,079,649 ("the '649 Patent"). The '649 patent generally relates to a method for preventing unauthorized copying of downloaded data in a computer system.

Pending before the Court is the issue of claim construction of various disputed terms of the patent-in-suit. The parties completed briefing on June 19, 2015. (D.I. 57, 59, 75, 76) The Court heard argument on claim construction on July 20, 2015. (*See* Transcript ("Tr."))

## II. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a

1

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v.*

2

*Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the

3

pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

### III. AGREED-UPON CLAIM TERM

The parties agree on the proper construction for the following claim term:

| Claim Term | Agreed-Upon Construction |
|---|---|
| under control of the program portion (claims 1, 10, 25) | performed by the program portion |

The Court will adopt the agreed-upon construction.

4

## IV. DISPUTED CLAIM TERMS

### A. (1) "program portion" [claims 1, 10, 22, and 25]
### (2) "program" [claims 9, 11, 19, and 23]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| (1) part of a program | (1) set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed |
| (2) sequence of instructions that can be executed by a computer | (2) [same as program portion] |
| **Court's Construction:** <br><br> (1) part of a program <br><br> (2) sequence of instructions that can be executed by a computer ||

The parties agree that a program portion is a "sequence" or "set" of "instructions," which can be "executed" by a computer. (*See* Tr. at 12-13, 27-28) Their primary disputes regarding "program portion" and "program" are (1) whether a program portion must be "a single entity, defined independently of the processing environment in which the instructions might eventually be executed," and (2) whether the term "program" should be construed identically to "program portion." The Court agrees with Plaintiff that the patentee did not limit the claims to program portions that are "a single entity, defined independently of the processing environment" and, further, that the term "program" carries a different meaning than "program portion."

During prosecution, the patentee attempted to distinguish a prior art patent, U.S. Patent No. 6,055,314 to Spies ("Spies"), by arguing that Spies disclosed a method for cryptographically protecting video content using two separate programs to perform the claimed method steps, while the patentee's invention uses only a single program to perform those steps. (*See* D.I. 53, Ex. C-3

5

at COPYP0000068-88) In that context, the patentee described the "program portion" claim term in a way that mirrors the language Defendant would have the Court read into the term:

> Claim 1 . . . requires that the same program portion generates and uploads a request for access to data and performs conversion of the cryptographically protected data to an unprotected form. The "same" program portion forms ***a set of instructions forming a single entity, defined independently of the processing environment in which the instructions might eventually be executed*** (although when they are executed, it would be in the context of the instructions being part of a single entity). The same program portion may be downloaded (see, e.g., dependent claim 7) as a whole, not fragmented and executed piecemeal. The "same" program portion allows an unbroken chain of control from the time during which the data set is in a protected form (i.e. an encrypted form) to control during conversion (e.g., decryption) of the data set into an unprotected form and for as long as the data set remains in the unprotected form. The chain of control provided by the "same" program portion thus remains unbroken.

(*Id.* at COPYP0000077-78 (emphasis added))

The Court is not persuaded that the patentee's statement during prosecution is sufficiently unambiguous to limit the meaning of the claim term "program portion." (*Id.* at COPYP0000077; *see also generally* Tr. at 37 (when asked "what defined independently of the processing environment really means," Defendant responded that "[u]nfortunately the applicants weren't really clear about what they meant about that")); *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) ("When a patentee makes a 'clear and unmistakable disavowal of scope during prosecution,' a claim's scope may be narrowed under the doctrine of prosecution disclaimer."). It appears that the statement at issue was offered by the patentee in an attempt to explain that, unlike the Spies prior art, claim 1 requires that the "same" program portion perform both of the method steps at issue, based on the limitations in the claim (that the program portion

both uploads the request for data and converts the data to unprotected form). Read in that context, this statement was an attempt to describe and explain those limitations,[1] rather than an effort to re-define the meaning of the term "program portion" to include only programs that are "defined independently of the processing environment in which the instructions might eventually be executed." (*See* Tr. at 26 (Defendant explaining that this statement during prosecution was "not really . . . about claim disavowal"))

Additionally, it is unclear what the practical implications might be of construing "program portion" to include a limitation that the program is "defined independently of the processing environment in which the instructions might eventually be executed." The specification and the prosecution history do not explain the meaning of this phrase, and contain no other suggestion that the "program portion" of the claim is limited to only certain kinds of programs. Hence, a construction that included Defendant's "defined independently" limitation might itself require further construction, in order for a jury to determine what kinds of programs do and do not meet that limitation. (*See* Tr. at 37-38 (Defendants expressing uncertainty regarding whether Java applet, as used in preferred embodiment, is "program portion" under their proposed construction))

As to the second dispute, a construction of "program portion" that is coextensive with "program" would read "portion" out of the claims – an inappropriate result. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1305 (Fed. Cir. 2014) (affirming district court's rejection of

---

[1] Some of the parties' statements at oral argument hinted that there could be a dispute as to the "unitary nature" of the program portion. (Tr. at 33, 36, 40-43) No such dispute was presented in the parties' briefs, however, and both proposed constructions require a "set" or "sequence" of instructions.

proposed claim construction that "reads [the construed language] out of the claim"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, No. 2013-1130, 2015 WL 3687459 (Fed. Cir. June 16, 2015).

Defendant points to the fact that the patentee referred to an "applet" as both a "program" and a "program portion." (*See* D.I. 53, Ex. C-3 at COPYP0000270 ("the program portion (e.g., a Java applet)"); *id.*, Ex. C-1 at COPYP0000072 (referring to "program (an applet)")) But that only indicates that the patentee viewed an applet as being both a "program" and a "part of a program," not that the terms "program" and "program portion" necessarily have the same meaning.[2] (*See* Tr. at 15-16 (Plaintiff stating that "hyper-technically" a Java applet can be viewed as either program or program portion))

- **B.** **(1)** **"selectively controlling access to copy or save functions at the client in respect of the data in its unprotected form" [claim 1]**

    **(2)** **"suppress client computer copy or save functions with respect to the unprotected copy of the requested data" [claim 9], "suppress client computer copy and save functions with respect to the unprotected copy of the requested data" [claim 23]**

    **(3)** **"restricting or preventing access to copy or save functions at the client in respect of the data in its unprotected form" [claims 10 and 25]**

    **(4)** **"restrict or prevent client computer copy or save functions with respect to the unprotected copy of the requested data" [claims 11 and 19]**

---

[2]The Board of Patent Appeals and Interferences also treated "program portion" and "program" similarly, in that they applied arguments regarding the "program portion" to claims that used only the "program" language. (D.I. 53, Ex. C-1 at COPYP0000032-34) But it is not clear whether the Board took the view that the terms were identical, or merely that the same analysis applied to both.

8

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| (1) disabling or enabling the user's ability to copy or save the unprotected data | (1) disabling functionality to copy or save the unprotected data that would otherwise be available at the client |
| (2) suppress the user's ability to copy or save the unprotected requested data | (2) suppress functionality to copy or save the unprotected data that would otherwise be available at the client |
| (3) restrict or prevent the user's ability to copy or save the unprotected data | (3) restricting or preventing functionality to copy or save the unprotected data that would otherwise be available at the client |
| (4) restrict or prevent the user's ability to copy or save the unprotected requested data | (4) restrict or prevent functionality to copy or save the unprotected data that would otherwise be available at the client |

**Court's Construction:**

(1) disabling or enabling functionality to copy or save the unprotected data that would otherwise be available at the client

(2) suppress functionality to copy or save the unprotected data that would otherwise be available at the client

(3) restricting or preventing functionality to copy or save the unprotected data that would otherwise be available at the client

(4) restrict or prevent functionality to copy or save the unprotected data that would otherwise be available at the client

The parties present two disputes regarding the above claim terms: (1) whether "controlling" includes "enabling," and (2) whether the functions that are controlled, suppressed, prevented, or restricted must be functions that "would otherwise be available at the client." The Court holds that "controlling" includes "enabling" and that the functions at issue must be otherwise available at the client.

As to the first dispute, the specification makes clear that the term "controlling" in claim 1

9

encompasses both enabling and disabling functions at the client. (*See* '649 patent, col. 9:36-46 (describing embodiment that "offer[s] an option to save the document in an unprotected format upon payment of an additional larger fee")) Defendant's construction would exclude that embodiment from the claims.

As to the second dispute, claim 1 describes "selectively controlling access to copy or save functions at the client." Implicit in that language is that the functions would otherwise be available at the client – if not, there would be no functions to "control."

Statements by the patentee during prosecution support Defendant's construction. In distinguishing the prior art, the patentee described "the present invention" as providing "functionality . . . to suppress access to [copy and save] functions *which are otherwise available in respect to particular data sets*." (D.I. 53, Ex. C-2 at COPYP0000168 (emphasis added)) A similar statement earlier in the prosecution was that "in the present invention, . . . the program portion (e.g., a Java applet) . . . is being used to restrict access to functions that would *otherwise be legitimately available at the client* (e.g., provided via the Java subsystem)."[3] (*Id.*, Ex. C-3 at COPYP0000270 (emphasis added))

Further, "controlling" includes "disabling" and "enabling" copy or save functionality. "Disabling" implies that the functions are otherwise available. As to "enabling," the act of enabling copy or save functionality when no such functionality would otherwise have been present would be in tension with the purpose of the invention, which is directed to protecting copyrighted works in situations where they would be at risk of being copied or saved by the user.

---

[3]The Court relies on this language not as a disclaimer but as additional support for the "otherwise available" limitation, which is already apparent from the claim language itself and the specification.

10

(*See* '649 patent, col. 1:41-48 (noting problem that "copyrighted works . . . may be readily copied onto the hard disk of a client's computer and replicated many times digitally."); *see also* D.I. 53, Ex. C-2 at COPYP0000166 (describing "selectively control" functionality of claim 1 as "***restricting*** access to a data set," not as ***providing*** such access) (emphasis added))[4]

At oral argument, Plaintiff argued that the phrase "otherwise be available at the client" would be unhelpful to the jury and would require further construction, because it is unclear whether those functions must have been otherwise available to the ***user*** (as opposed to, for example, the programmer of an application). (Tr. at 46-49, 60-61) However, the patent specification makes clear that the invention is directed toward protecting copyrighted works from infringement by the end user of a computer system. (*See, e.g.*, '649 patent, cols. 1:41-48, 2:21-24, 5:60-6:20, 9:2-9) Thus, functions "otherwise available at the client" include only those functions that would have been presented or otherwise available ***to the user*** absent some action on the part of the programmer.

The "otherwise available" limitation applies equally to the remaining phrases at issue, which relate to claims 9, 10, 11, 19, 23, and 25. These phrases use words like suppressing, restricting, or preventing copy or save functionality – terms that imply that such functionality would otherwise be available in some fashion. Absent such pre-existing copy or save functionality, there is nothing to restrict, prevent, or suppress.

---

[4]This purpose is also reflected in the title of the invention, "Copy Protection of Data," and in the specification's description of the embodiments. (*See, e.g.*, '649 patent, col. 2:21-24 ("As a result of processing a Java applet, the usual copy and save functions will not be presented to the user, thereby providing security in respect of the unprotected data presented to the user."); *id.*, cols. 5:60-6:20, 9:2-9, 9:35-46 (describing how copy and save functions that would otherwise be presented to user upon click of right mouse button on copyrighted material are no longer presented, or are presented only upon payment))

11

### C. "determining a machine identifier of the client by analysing its hardware and/or its software configuration" [claim 18]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier | scanning the arrangement of the hardware and/or software of the client to determine a machine identifier |

| Court's Construction: |
|---|
| ascertaining characteristics of the hardware and/or software of the client to determine a machine identifier |

The parties' dispute regarding this claim term is whether "analyzing" should be replaced with "ascertaining characteristics of" or "scanning the arrangement of." The Court concludes that Plaintiff's phrasing, "ascertaining characteristics of," is more appropriate. Defendant's proposed construction would improperly limit the claim term "analyzing" to the single "scanning" embodiment disclosed in the specification. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").[5]

---

[5] Defendant asserts that Plaintiff's proposed construction would render the claim invalid for indefiniteness and lack of enablement, but Defendant presents these arguments in a conclusory fashion (D.I. 57 at 11-12), and the Court will not address them at this time.

### D. "cryptographically protecting the data" [claims 1, 10, and 25]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| protecting the data by encryption and/or by an integrity checking procedure | cryptographically protecting the data at the server |

**Court's Construction:**

protecting the data by encryption and/or by an integrity checking procedure

With regard to this claim term, the parties dispute whether the data must be protected "at the server." The Court concludes that the step of cryptographically protecting the data need not be performed at the server.

The claims and the specification include no explicit limitation that the cryptographic protection must be performed "at the server." Defendant nonetheless asserts that the data protection must be performed at the server because that is where it occurs in the "sole embodiment." (D.I. 57 at 15-16 (citing '649 patent, figs. 3, 5, 6)) But the fact that a disclosed embodiment (even the sole embodiment) includes a limitation is insufficient to read that limitation into the claims. *See Kara Tech.*, 582 F.3d at 1348.

Defendant also asserts that, logically, the data protection cannot be performed at the client, because the client must receive the data in protected form. But that conclusion does not dictate that the server must perform the protection, because there is no statement in the claims or specification that the client and server are the only computers involved in performing the method.

Plaintiff's construction is otherwise supported by the specification, which states that "[t]he data may be cryptographically protected by encryption and/or by an integrity checking procedure such as hashing." ('649 patent, col. 1:60-62)

13

### E. (1) "a server computer" [claims 9, 11, 19, and 23]
### (1) "a server" [claims 1, 9, 10, 11, 19, 23, and 25]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| (1) one or more computers that are capable of providing information by receiving and responding to requests | (1) one or more computers, each capable of performing all recited server-side steps |
| (2) one or more processing devices that are capable of providing information by receiving and responding to requests | (2) [same as a server computer] |
| **Court's Construction:** <br><br> (1) one or more computers that are capable of providing information by receiving and responding to requests <br><br> (2) one or more processing devices that are capable of providing information by receiving and responding to requests ||

Both parties' constructions encompass a "server" or "server computer" consisting of one or more processing devices or computers. The dispute is whether, as Defendant proposes, each computer must be capable of performing all recited server-side steps. The Court concludes that there is no limitation in the claims that requires each device that forms a "server" or "server computer" to be capable of performing all of the recited server-side steps.

Defendant first argues that the "sole embodiment" in the written description "utilize[d] a single server to perform all of the recited steps," and that the specification generally referred only to "a server," rather than a distributed server where each computer is individually capable of performing only some tasks. (*See* D.I. 57 at 12-13) But both proposed constructions encompass the use of multiple computers as a server, and Defendant confirmed at oral argument that its construction encompassed multiple different servers performing the steps of the claim, as long as all of the servers are capable of performing each of the steps. (Tr. at 107 ("Netflix isn't even

14

arguing that you couldn't theoretically have maybe different servers each performing the steps."))
The relevant question, then, is whether each of those computers that makes up the server must be "capable of performing all recited server-side steps" – and Defendant offers little support from the specification or prosecution history as to that issue.

Defendant suggests that Plaintiff's construction would conflict with the patentee's description of the invention during prosecution as entailing "an unbroken chain of control" over the data. (D.I. 53, Ex. C-1 at COPYP0000077) But that argument by the patentee related to the software at the *client*, not the server. (*Id.*) Moreover, the chain of control is equally "broken" regardless of whether each separate computer that may perform each step is "capable" of performing the other steps as well.

Finally, Defendant relies heavily on other cases construing the same or similar claim terms. (*See* D.I. 57 at 13-14; D.I. 75 at 12; *see also FotoMedia Technologies, LLC v. AOL, LLC*, 2009 WL 2175845, at *6 (E.D. Tex. July 21, 2009); *Zapmedia Servs., Inc. v. Apple, Inc.*, 2010 WL 8599970, at *3 (E.D. Tex. Aug. 19, 2010), *aff'd*, 482 F. App'x 533 (Fed. Cir. 2012); *MasterObjects, Inc. v. Google, Inc.*, 2013 WL 2319087, at *7-10 (N.D. Cal. May 28, 2013)) Plaintiff attempts to distinguish these cases. (D.I. 76 at 16-17) The Court finds these cases to be helpful, but not binding, and ultimately they do not persuade the Court to adopt Defendant's proposed construction.

F.  "sending the cryptographically protected data to the client" [claims 1, 10, and 25]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| sending the cryptographically protected data to the client (no need to construe) | sending the cryptographically protected data from the server to the client |

| Court's Construction: |
|---|
| sending the cryptographically protected data from a server to the client |

It is clear that the data referred to in the claims at issue originates at a server, because the preambles to the claims each state that the data is "sent from a server to a client." However, given the Court's conclusion above that multiple server computers may be used to perform the steps of the claims, it would be incorrect to require that the data be sent from "*the* server" as opposed to needing to be sent from "*a* server." At the hearing, Plaintiff agreed with this construction proposed by the Court (*see* Tr. at 99-100), and the Court now adopts it.

G.  "a request for access to data" [claims 1, 10, and 25]

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| a request to receive data | a request for permission to receive data from the server |

| Court's Construction: |
|---|
| a request for permission to receive data from a server |

The parties dispute (1) whether the request must be for "permission" to receive data, and (2) whether that data must come from the server. The Court will construe this term to mean "a request for permission to receive data from a server."

As to the first dispute, the claim language indicates that the client does not request the

16

data itself, but instead requests "access" to that data – i.e., that the client be allowed to receive, or retrieve, such data. This is consistent with the first portion of Defendant's proposed construction, "a request for permission to receive data." Plaintiff's proposed construction is inconsistent with the claims, as Plaintiff would have the user request the data itself rather than (as the claims require) request "access" to the data.

Plaintiff points to dependent claims 5 and 18, which involve "authenticating that the client is permitted to receive the data" and "identifying the client to the server, to permit . . . data to be downloaded," suggesting that these claims show that the patentee distinguished between requesting "access to the data" and "'permission' to access the data." (D.I. 58 at 12-13) But neither of those claims conflict with a construction of "a request for access to data" as "a request for permission to receive data." Instead, each of those claims describes a specific *means* for requesting access to data.

As to the second dispute, the Court concluded above that the language in the claims indicates that the requested data is sent from a server to the client. (*See also* Tr. at 75 (Plaintiff agreeing that data must be sent from "a" server)) The same conclusion applies here.

### H. Order of the Steps [claims 1, 10, and 25]

The parties dispute the whether the first and second steps of the claims must be performed in order. Each of claims 1, 10, and 25 includes the following steps: (1) running a program portion to request access to data, (2) cryptographically protecting the data, (3) sending the data to the client, and (4) converting the data to an unprotected form. The Court concludes that steps one and two need not be performed in any order, and as such the data may be cryptographically protected before it is requested. The parties agree that the remaining steps –

17

steps three and four – must be performed in order, and must be performed after steps one and two.

The Federal Circuit has stated that "[s]teps in a method claim need not necessarily be performed in the order they are written," but "if grammar, logic, the specification, or the prosecution history require the steps to be performed sequentially, then the claims are so limited." *Apple*, 757 F.3d at 1305.

Defendant has not shown that the claims' grammar or logic requires that steps one and two be performed sequentially. The steps of the claims are not numbered, and the first two steps – unlike the third and fourth steps – include no explicit limitation regarding the order in which they must be performed. Defendant suggests that the fact that steps three and four include an explicit order shows that the entire claim has "a logical order," and that steps one and two must therefore be performed in order as well. (D.I. 57 at 18-19) But there is nothing before the Court to show that the invention cannot function equally well regardless of the order in which steps one and two are performed; either way, the data is prepared for delivery to the client in protected form, such that steps three and four may occur. There is no logical requirement in the claims that steps one and two be performed in order, as long as those steps are collectively performed prior to steps three and four.

This construction is supported by the specification, which refers to an implementation that is agnostic as to the order in which the steps are performed. (*See* '649 patent, cols. 1:63-2:5 (stating that, in one embodiment, "a request is uploaded to the server for a file containing the cryptographically protected data," which suggests that the file may already contain protected data at the time at which it is requested)) Also, two other independent claims, claims 11 and 19, lack

18

the first two steps entirely, further suggesting that (if performed) they need not be performed in a particular order.⁶

## V. CONCLUSION

An appropriate Order follows.

---

⁶Defendant cites several cases in favor of its proposed construction, including *Respironics, Inc. v. Invacare Corp.*, 303 Fed. Appx. 865 (Fed. Cir. 2008). In *Respironics*, the Federal Circuit held that where a claimed method step referred to "selected . . . pressure magnitudes," those pressure magnitudes must be "selected" prior to the step that refers to them. 303 Fed. Appx. at 870. This conclusion was based, at least in part, on the specification's disclosure of only a single embodiment, in which the pressure magnitudes were selected in advance. *See id.* The claims at issue here have no language similar to the "selected" language of *Respironics* and, as discussed above, the specification refers to at least one embodiment that is agnostic as to whether the data is cryptographically protected before or after the request. (*See* '649 patent, col. 1:63-67)

The other two cases cited by Defendants are also distinguishable, because they involved claims that were numbered or lettered. *See Aerotel, Ltd. v. Telco Group, Inc.*, 2010 WL 1916015, at *6-8 (S.D.N.Y. May 10, 2010) (involving claim that "list[ed] the steps in lettered order"), *aff'd in part, vacated in part on other grounds*, 433 Fed. Appx. 903 (Fed. Cir. 2011); *Michael S. Sutton Ltd. v. Nokia Corp.*, 647 F. Supp. 2d 737, 743 (E.D. Tex. 2009) (holding that numbered steps claimed using "logically progressive language" must be performed in order, and noting that order of the steps was not "the true dispute"), *aff'd*, 2010 WL 5230901 (Fed. Cir. 2010).

19